******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ESPINOSA, J., joins, dissenting. Although I disagree with virtually all of the majority's analysis and conclusions, I write, in particular, to express my strong objection to the majority's creation and application of a new exception to our well established standard of review, an exception that allows this court to engage in a de novo review of live expert testimony presented in a habeas proceeding. This new standard is driven by the majority's disagreement with the habeas court's[1] credibility findings, which, if allowed to stand, are fatal to the claims raised by the petitioner, Richard Lapointe. The deferential clear error standard of review that applies to credibility assessments in this context bars the majority from substituting its own judgment for that of the habeas court; and the record, which contains ample support for the habeas court's findings, prevents a finding of clear error. Hopelessly trapped between its unwillingness to accept the habeas court's findings and its inability to overturn them under our clear error standard, the majority summons down its deus ex machina: a singular exception to our clear error standard of review, created just for this case and those cases "indistinguishable" from this one, that empowers the majority to reach its desired ending by retrying in *this* court the credibility issues settled in the habeas court. This court, however, is not a fact-finding court, and we do not judge the credibility of witnesses because we lack the constitutional authority to do so. By making its own findings about the credibility of expert testimony, the majority exceeds the limits of our jurisdiction and unjustifiably usurps the habeas court's role as fact finder, thereby turning the hearing in that court into little more than an exercise in futility.

The habeas court proceeding is more than just a conduit for logging the evidence, and that court's findings represent more than a suggestion. The habeas court is the sole trier of fact and assessor of credibility, with the exclusive power to determine the credibility of the testimony presented to it. See, e.g., *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 604, 103 A.3d 954 (2014); *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 690, 51 A.3d 948 (2012). We consistently have deferred to its exclusive role in this regard, properly relegating our role to reviewing its fact and credibility findings *only* to determine whether they find support in the record. See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 604.

This court's power to draw conclusions of fact and credibility is proscribed not only by practical considerations—unlike the trier, we do not receive evidence firsthand—but also by the limits of our constitutional function. For more than one century, this court has repeat-

edly recognized that it simply does not have the jurisdiction under our constitution to resolve disputed questions of fact or to assess the credibility of testimony, irrespective of the nature of the claim or the type of evidence presented to the trier of fact. *Styles* v. *Tyler*, 64 Conn. 432, 442, 30 A. 165 (1894). The bifurcation of the Superior Court from the appellate level courts leaves the *Superior Court* as the final arbiter of fact disputes and limits our role to resolving questions of law. Id., 444–47. Consequently, we lack jurisdiction to resolve disputed questions of fact and credibility, regardless of how this court may attempt to cast the nature of its inquiry. *Dexter Yarn Co.* v. *American Fabrics Co.*, 102 Conn. 529, 538, 129 A. 527 (1925). Adhering to this principle, this court has repeatedly rebuffed suggestions by litigants—and even some judges of this court—that we may substitute our judgment for that of the trier of fact when the trier of fact has made credibility findings after receiving and weighing the evidence. See, e.g., *Skakel* v. *State*, 295 Conn. 447, 487 n.25, 991 A.2d 414 (2010) ("[t]his court . . . squarely has rejected the proposition that a less deferential standard than abuse of discretion should apply to review of decisions pertaining to evidence [even when such decisions are] not predicated on an assessment of the witness' demeanor").

By allowing this court to substitute its own judgment for that of the habeas court on questions about witness credibility, the majority has exceeded our jurisdiction. Our law is clear that assessing new witness credibility in the *Strickland*[2] prejudice/*Brady*[3] materiality context presents a question of *fact* for the *habeas court* and that, consistent with our jurisdictional limits, we defer to its findings. See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 604, 611; *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 690–91. Our constitution and case law simply do not permit this court to usurp the primary and exclusive function of the Superior Court. By granting itself a license to review de novo the live expert testimony presented to the habeas court, the majority has placed itself outside the limits of our authority and installed itself as both the *trier* and *reviewer*—a duality of power that this court previously has labeled as "evil . . . ." *Styles* v. *Tyler*, supra, 64 Conn. 449.

Compounding the impropriety of its analysis, the majority has adopted a standard allowing it to find facts even though neither party has asked this court to do so. Because the majority has adopted its new standard sua sponte, neither party had any notice or opportunity to brief the propriety of such a standard. Furthermore, neither party—most notably not even the petitioner—has claimed that the habeas court's credibility findings were incorrect, so neither party has briefed the merits of the credibility issues decided by the majority. Nevertheless, the majority has not asked the parties to provide

any supplemental briefing, leaving the majority to engage in its new fact-finding role, which it has created sua sponte, without any meaningful notice to or guidance from the parties, in violation of the principles recently set forth in *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 128, 84 A.3d 840 (2014) (*Blumberg*).

Finally, although the majority arrogates to itself the responsibility to make its own findings of fact and determinations of credibility, it ultimately proves unequal to the task. Rather than expressing its *own* findings based on its review of the record, the majority launches a seemingly endless attack on the habeas court's findings—an unnecessary exercise in light of the majority's self-created fact-finding power. Furthermore, in carrying out its purportedly de novo analysis of the record, the majority utterly ignores testimony from the *petitioner's own expert witnesses* and other evidence that amply supports the habeas court's findings and casts serious doubt on the credibility of their testimony.

In short, although the majority goes out of its way to retry the case, I am constrained merely to review it. Deferring to the habeas court's fact-finding role, my own review of the record convinces me that its findings were not clearly erroneous. In light of its findings that the petitioner's new evidence did not reliably establish a burn time that supported the petitioner's alibi defense, I am persuaded that the petitioner has not met his burden under *Strickland* and *Brady*.

My analysis in this opinion will proceed in three parts: first, I address why the majority's new standard for reviewing the testimony of expert witnesses contravenes our law; second, I address why the majority's decision to decide issues that the parties have not raised or briefed violates the principles in *Blumberg*; and, third, I explain why the record supports the habeas court's findings, which leads to the conclusion that the petitioner has failed to meet his burden under *Strickland* and *Brady*.

I

STANDARD OF REVIEW

The principal issue presented in this appeal concerns the petitioner's burden, under the prejudice/materiality element of a *Strickland* or *Brady* claim, to prove the credibility of new witness testimony, and the habeas court's role in determining whether a petitioner has met that burden. Assessing credibility of new witness testimony in the *Strickland* and *Brady* context requires the habeas court to determine whether there is a reasonable probability that a new jury would credit the testimony, and it presents a question of fact that an appellate tribunal reviews only for clear error. See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 604, 611. Although the habeas court in the present case

declined to find the petitioner's new expert testimony credible and denied the petitioner's claim on that basis, the Appellate Court did not acknowledge the habeas court's role in making credibility assessments. See *Lapointe* v. *Commissioner of Correction*, 138 Conn. App. 454, 476–77 n.17, 53 A.3d 257 (2012). Instead, the Appellate Court decided that assessing the credibility of new witnesses should be left entirely to a new jury, and not the habeas court. Id. By determining that a jury, and not a court, should assess credibility, the Appellate Court effectively removed any requirement that the petitioner make a credibility showing as part of his *Strickland* and *Brady* claim. As a result, the Appellate Court analyzed the petitioner's claim by hypothesizing what a jury *could* find, *if* it credited the new evidence. See id., 476–78 and nn.17–20. The Appellate Court granted the petitioner a new trial on the basis of the results of this speculation. Id., 478, 480. The issue presented in this appeal is whether the Appellate Court properly concluded as it did.

The success of the petitioner's *Strickland* claim—which is based on his prior habeas counsel's failure to raise a *Brady* claim concerning the state's failure to disclose a certain note prepared by Detective Michael Ludlow of the Manchester Police Department (Ludlow note)—depends on the credit that may be afforded the testimony of the petitioner's expert witnesses. A finding that this expert testimony was credible was necessary if the petitioner was to have any hope of establishing that the state's failure to disclose the Ludlow note prejudiced him by preventing him from presenting a viable alibi defense at trial. To demonstrate that he would have been able to present such a defense, he relied on the testimony of two expert witnesses to establish the time period during which the fire that consumed the apartment of the victim, Bernice Martin, likely started, together with testimony of his former spouse, Karen Martin, to establish that he was at home during that same time period. To prove prejudice, the petitioner needed to show a reasonable probability that a jury would credit this expert testimony and that the new credible testimony, when weighed against the original trial evidence, gives rise to a reasonable probability of a different result. A credible alibi defense, when weighed against the trial evidence, certainly would support findings of prejudice under *Strickland* and materiality under *Brady*. If, however, a jury was not reasonably likely to credit the petitioner's new alibi evidence, the petitioner would have no *valid* evidence of the fire's start time, and his alibi claim would fail. Thus, without a credible alibi defense, the petitioner could not demonstrate that his prior habeas counsel's errors or the state's failure to disclose the Ludlow note caused him any harm.[4]

At the petitioner's habeas trial, the habeas court heard testimony from five fire investigation experts: the

two experts who originally investigated the scene for the state shortly after the fire; the two experts called by the petitioner, and an expert called by the respondent, the Commissioner of Correction. The habeas court did not credit the opinions of the petitioner's experts, finding that their testimony could not credibly establish a burn time that was precise enough to support the petitioner's alibi claim. The court explained as follows: "The court . . . notes that it finds less credible the attempts to provide more precise burn time estimations. Given the complexity of fires and the many factors or dynamics that impact a fire, a complexity which is patently evident from the testimony of [the petitioner's and the respondent's experts], it is impossible to establish with precision when the fire was set. *Thus, the more precise the estimate, the less credible the court finds the opinion. What is clear from all the evidence in the record, the original trial testimony, crime scene photographs, reports, and the expert testimony presented to this court on the fire, is that the precise time the fire was set cannot be determined. At best, a range is established that includes that time period of 6:15 p.m. to [7] p.m. (fire could have been burning between 5:45 p.m. and 7:55 p.m.), when [Karen] Martin cannot account for the petitioner's whereabouts and does not provide an alibi for him.*" (Emphasis added.) The habeas court's finding that the petitioner's burn time evidence was not credible led it to conclude that the petitioner had failed to meet his burden of proving his claims under *Strickland* and *Brady,* and the habeas court denied the habeas petition.

The Appellate Court reversed the judgment of the habeas court and, in doing so, analyzed the petitioner's claim without acknowledging the habeas court's role in assessing credibility of new witness testimony in this context. See *Lapointe* v. *Commissioner of Correction,* supra, 138 Conn. App. 476–77 n.17. The Appellate Court instead concluded that such an assessment must be left to a new jury, not a court. Id. The Appellate Court explained as follows: "If the Ludlow note had been disclosed to trial counsel . . . *it would have been the responsibility of the jury and not the court to weigh the credibility of the arson experts.* Whether the burn time evidence, which was so critical in buttressing [the petitioner's] alibi defense, raised a reasonable doubt as to the petitioner's guilt would best be a determination left to the jury and not a habeas court." (Emphasis added.) Id. After so concluding, the Appellate Court analyzed the case by hypothesizing about what a jury "could" find "[i]f" it credited the new testimony. Id., 476, 477. For example, the Appellate Court stated: "At the . . . habeas trial, the [petitioner's] two experts . . . testified that the fire could not have been set any earlier than 7:30 p.m. *If that testimony had been presented at the criminal trial, and credited by the jury,* the petitioner's whereabouts at and after 7:30 p.m.

would have been critical to his defense. . . . *If the jury credited* Karen Martin's testimony, it *could have concluded* that the petitioner was at home watching television with her and their son when the fire had been set." (Emphasis added; footnote omitted.) Id., 476–77. The Appellate Court concluded by explaining: "With the burn time estimate provided by one of the state's fire marshals, [the petitioner's criminal] trial counsel testified that they would have retained the services of an arson expert and that Karen Martin would have testified as to the petitioner's whereabouts during the critical times of [the] evening [of the victim's murder]. That evidence, *if believed by the jury, could have resulted* in the jury's finding that it was temporally impossible for the petitioner to have committed the crimes [of] which he was convicted." (Emphasis added.) Id., 479. On the basis of its speculation, the Appellate Court concluded that the petitioner was entitled to a new trial because his evidence, *if credited*, would support his alibi defense. Id., 479–80. Contrary to the majority's assertions, the Appellate Court did *not* analyze the habeas court's credibility findings; nor did it make its *own* findings with respect to whether there was a reasonable probability that a jury would credit the new testimony. See generally id., 468–80. Rather, it left any credibility assessments to a jury, not a court, effectively relieving the petitioner of any burden to establish the credibility of his new witness testimony as part of his claim based on *Strickland* and *Brady*.[5] See id., 476–77 n.17.

The respondent appealed to this court upon our grant of certification; *Lapointe* v. *Commissioner of Correction*, 307 Conn. 940, 940–41, 56 A.3d 948 (2012). The respondent claims that the Appellate Court improperly disregarded the habeas court's role in assessing credibility and did not properly consider all of the evidence in the record in considering the ultimate questions of prejudice under *Strickland* and materiality under *Brady*. Contrary to the majority's view, neither of the parties has claimed that the Appellate Court performed its own, de novo credibility assessment. Rather, both the respondent and the petitioner agree that the Appellate Court left the credibility issue to a new jury, not a court. Specifically, the respondent argues that, by leaving the credibility assessment of new witness testimony to a jury, the Appellate Court improperly disregarded the habeas court's role as fact finder and arbiter of credibility in habeas proceedings, and improperly reached its decision on the ultimate issues of materiality and prejudice by "speculating on the basis of what 'could have' happened 'if' certain evidence had been believed." (Emphasis omitted.) The respondent cites cases holding that mere conjecture or speculation is not sufficient to demonstrate prejudice and argues that, "[i]n saying that jurors could have reached a conclusion if they believed certain testimony, the Appellate Court

said no more than that this was possible or conceivable" and thus did not base its materiality decision on "that which was reasonably probable in light of the habeas court's finding regarding credibility and the entirety of the evidence [in the] record," as the *Strickland/Brady* standard requires.[6] In response, the petitioner acknowledges the respondent's claim that the Appellate Court improperly decided that the credibility issue was "a jury issue" and argues that it was not up to the habeas court to decide whether to credit his experts, each of whom was qualified to render an opinion.

The majority affirms the judgment of the Appellate Court but takes a much different approach than the Appellate Court did, an approach that neither party has requested and that the Appellate Court did not employ. Rather than analyzing the case by assuming that the jury would credit the evidence, as the Appellate Court did, the majority concludes that an appellate tribunal must make *its own* findings about the credit that may be given to the petitioner's new expert testimony, a standard of review that has no precedent in our law. Although the majority acknowledges the deference we owe to the fact-finding role of the habeas court, including in the *Strickland/Brady* context, it decides that no such deference is warranted in the present case because the "highly unusual" circumstances of this case require a "limited exception" to that rule. According to the majority, we defer to fact and credibility findings of the habeas court when those findings are "made on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude." (Internal quotation marks omitted.) Text accompanying footnote 40 of the majority opinion. The majority then explains, however, that, when a finding is not based on those factors, this court is as well suited as the habeas court to assess the testimony of the petitioner's experts and, therefore, may evaluate that testimony de novo, without any deference to the findings of the habeas court. The majority, of course, fails to cite any authority from this state for this proposition because none exists—this court has never performed such a review, and it has uniformly rejected the notion that it could do so. In resolving disputed issues of credibility by making its *own* findings on the basis of its *own* assessment of the testimony and evidence presented to the habeas court, the majority has not just reviewed, but has *retried* the habeas case in *this* court. I emphatically disagree with the majority's decision to fashion a new standard of review just for this case.

### A

Until today, our case law was clear that determining whether a jury is reasonably likely to credit new witness testimony in the *Strickland/Brady* context presents a question of fact for the habeas court, not a new jury, and most assuredly not for an appellate tribunal. Our

review is limited to determining whether the habeas court's findings are reasonable in light of the record. This issue is not a question of law, and we do not substitute our judgment for that of the habeas court by reviewing the habeas court's credibility findings de novo.

At the outset, I note that I agree with the majority when it states, as it must, that the *Strickland* prejudice standard is identical to the *Brady* materiality standard, and that the respective roles of the habeas and reviewing courts are the same under both standards. See, e.g., *State* v. *Dupigney*, 295 Conn. 50, 60–63, 988 A.2d 851 (2010). I will therefore analyze the principles that apply to these claims together and, for simplicity, will refer to the standard as the "*Strickland/Brady* prejudice" standard.

The *Strickland/Brady* prejudice standard presents a mixed question of law and fact. To prove prejudice, a defendant must establish that, in the absence of the substandard performance of defense counsel or the state's suppression of exculpatory evidence, there is a " 'reasonable probability' " that the result of the criminal trial would have been different. *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); accord *Strickland* v. *Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Resolving the ultimate question of prejudice requires a court to consider or weigh the new or different evidence—which was not presented at the original trial because of counsel's or the state's actions or omissions—against the original trial evidence to determine the likelihood of a different result. See, e.g., *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 373, 71 A.3d 512 (2013). We exercise plenary review over the ultimate question of whether the defendant suffered prejudice, which requires an application of the legal standard to the facts. See, e.g., *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 510, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009); *State* v. *Ortiz*, 280 Conn. 686, 720, 911 A.2d 1055 (2006).[7] When, however, the historical facts supporting the defendant's claim are disputed, the resolution of these underlying disputes presents a question of fact for the habeas court, which we review only for clear error. See, e.g., *Bryant* v. *Commissioner of Correction*, supra, 509; *State* v. *Ortiz*, supra, 720. We defer to the trier's resolution of these underlying disputes unless it is shown to be clearly erroneous. *Bryant* v. *Commissioner of Correction*, supra, 509; *State* v. *Ortiz*, supra, 720.

Although the ultimate question of prejudice focuses on the impact that the new evidence might have on the original trial evidence, determining whether there is a reasonable probability of a different outcome *also* requires some threshold finding that the new evidence

is credible—after all, if new evidence is not worthy of belief, it cannot lead to a different result at a new trial. To be sure, some cases do not present such credibility issues. For example, suppose the state withheld an exculpatory report by a government officer that appears to contradict testimony that the officer gave at trial. If the parties stipulate to the authenticity and content of that report, there are no threshold fact or credibility disputes to be resolved, and the habeas court need only consider the impact of that report on the original trial evidence, an analysis that is subject to de novo review by an appellate court.

Frequently in *Strickland* cases, though less often in *Brady* cases, the new evidence is testimony from a lay or expert witness who was not called at the original trial. When, as in the present case, the petitioner claims that his counsel or the state deprived him of the opportunity to present certain testimony, the petitioner has the burden of proving that the testimony is credible. *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 598–601, 604. If the testimony is not credible, then it cannot support a finding of prejudice under *Strickland* or *Brady*. See id., 611–13.[8]

This threshold issue of whether new testimony may be credited in this context—whether lay or expert testimony—presents a question of *fact* for the *habeas court* to resolve.[9] The habeas court, as the trier of fact in habeas proceedings, must assess the credibility of the new testimony, considering it together with other evidence and testimony presented to the habeas court, to determine whether there is a reasonable probability that a new jury would credit the new testimony.[10] See, e.g., id., 604, 611–12. The habeas court—with its unique ability to receive the new testimony and evidence firsthand and to consider it in the context in which it was presented—is unquestionably in the best position to perform this credibility analysis.[11] After all, the habeas court is the *only* court hearing the petitioner's claims and the *only* one that can assess the new evidence in the same manner as a *jury* would.

When assessing a habeas court's fact and credibility findings, including in the context of *Strickland* and *Brady* claims, our role as an appellate tribunal is limited. We do not undertake our own de novo review of the habeas court's findings; rather, we review them under our well established clear error standard. We have often explained: "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Thus, [t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the

trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) Id., 604; see also *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 368–69 n.14 (noting, in context of *Brady* claim, our "well established standard of review" requiring this court to defer to habeas court's findings unless they are clearly erroneous). Furthermore, our cases also demonstrate that we defer to the habeas court's findings regardless of whether that court credits or rejects the testimony of a petitioner's new witnesses. See, e.g., *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 688, 690 (upholding decision to grant new trial when habeas court found new alibi testimony to be "credible and compelling"). When reviewing for clear error, we will reverse the trial court's or habeas court's findings "only in the clearest of circumstances, [when] its conclusion could not reasonably be reached." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 125, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 222, 435 A.2d 24 (1980). An appellate tribunal may not reject a finding "merely because the reviewing judges personally disagree with the conclusion or would have found differently had they been sitting as the [fact finder]." *Kaplan* v. *Kaplan*, 186 Conn. 387, 391, 441 A.2d 629 (1982).

The majority, and the Chief Justice in her concurring opinion, both suggest that we may treat our review of this credibility assessment differently from a review of credibility findings made at a trial because, in this context, the habeas court is rendering a probabilistic judgment about how a jury might assess certain evidence. This is incorrect.

Although determining how a jury might assess testimony requires some measure of a predictive judgment, we recently—and unanimously—made clear that this assessment is no different from any other credibility assessment and is entitled to the same deference by a reviewing court. In a decision penned by the author of the majority in this case and released on December 2, 2014, we explained that determining whether it is reasonably probable that a jury would credit new witness testimony presents a question of fact for the habeas court that we review only for clear error. *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 611–12 and n.16; see id., 611 (upholding denial of habeas petition based on new witness testimony because "*perhaps most important, the habeas court concluded that a jury was unlikely to have found* [*the new witness*] *credible, and we agree with the Appellate Court that the habeas court's finding in this regard* [*was*] *not clearly erroneous*" [emphasis added]). Unlike the majority's decision

in the present case, we did *not*, in *Sanchez*, draw our *own* conclusions about the credibility of the new witness testimony. See id., 602 n.12, 611–12 and n.16. We made clear that the habeas court's role in determining whether a jury might credit new evidence is no different from a traditional credibility analysis and that we will defer to the habeas court's resolution of this issue. See id., 604, 611–12 and n.16; see also id., 602 n.12.

Assessing credibility requires the habeas court to approach its analysis neutrally, as a second jury would, without considering the new testimony in a manner favorable to either party, and it must consider *all* of the evidence presented. See id., 611 n.16 ("we . . . presume, in the absence of any indication to the contrary, that the [habeas] court considered all of the evidence when assessing [the new witness'] credibility"). This includes the attitude, candor and demeanor of the witnesses.[12] Id., 604. Just as with any other credibility analysis, the habeas court must consider the credibility of the new testimony in light of impeachment evidence and any other testimony or evidence presented to the court.[13]

Contrary to the majority's position, we do not alter our standard of review, even when the petitioner's claims are based on new expert testimony. See *Anderson* v. *Commissioner of Correction*, 313 Conn. 360, 375, 380–81, 98 A.3d 23 (2014), cert. denied sub nom. *Anderson* v. *Semple*, U.S. (83 U.S.L.W. 3678, February 23, 2015). In *Anderson*, this court deferred to the habeas court's credibility assessments of new expert testimony even though the habeas court did not expressly base its findings on the experts' demeanor. Id., 371–72, 377–80 and nn.7–8. In doing so, we disagreed with the conclusions of a dissenting Appellate Court judge who had reviewed de novo the credibility of the petitioner's new expert testimony. See id., 373–74 n.5. The petitioner in that case, Oscar Anderson, challenged his conviction of first degree sexual assault and risk of injury to a child. See id., 362–63. Anderson claimed that his trial counsel rendered ineffective assistance by not presenting medical records and expert testimony to show that he suffered from one or more sexually transmitted diseases (STDs) during the time period that the assaults occurred, and expert testimony on the transmission rates of STDs. Id., 362. Anderson argued that this testimony and evidence, coupled with the victim's lack of any STD during the relevant time period, would establish that he was prejudiced by his trial counsel's failure to present this evidence. See id., 373. At the habeas hearing, Anderson presented the testimony of Timothy Grady, an expert witness. Id., 366–69. Grady testified that Anderson's medical records showed that he was treated for STDs several times during the period when the assaults allegedly occurred and that, under the circumstances of the case, there was a 40 percent chance of Anderson transmitting an STD to the victim

during each act of intercourse. Id.; see also id., 379 n.8. Grady admitted, however, that there were no positive lab results to demonstrate that Anderson was infected with an STD during the relevant period but that Grady's assessments were based on the fact that Anderson had been treated in a hospital's emergency department for STD related symptoms. See id., 366–67.

The respondent in *Anderson* also presented expert testimony on this subject. Id., 369–70. The respondent called Stephen Scholand, a physician, who testified that other ailments that Anderson suffered from could be responsible for his STD related symptoms. Id., 369. Scholand also testified that, even if Anderson had an STD, that there was only a 30 percent chance of transmitting it from adult to adult during each act of intercourse. Id.

The habeas court found that Anderson's expert testimony lacked a sufficient factual foundation to establish that he suffered from any STD during the relevant time period. See id., 371–72. That court determined that, without any test results to support Anderson's claims of an STD when the assaults occurred, his expert evidence could not credibly prove that he suffered from an STD at that time. See id. The habeas court also concluded that, even if Anderson had demonstrated that he had an STD during the relevant time period, there was only a 30 percent chance of transmission, implicitly rejecting the opinion of Anderson's expert that the rate would have been higher under the circumstances. See id., 372. On the basis of these findings, the habeas court rejected Anderson's claims. See id., 372–73.

On appeal, a divided Appellate Court affirmed. *Anderson* v. *Commissioner of Correction*, 128 Conn. App. 585, 598, 17 A.3d 1138 (2011). The Appellate Court majority, relying on the habeas court's findings, upheld that court's decision that Anderson's evidence fell short. See id., 597–98 and n.7. Judge Borden, in dissent, thought, however, that Anderson had met his burden under *Strickland*. See id., 598–99 (*Borden, J.*, dissenting). In analyzing the prejudice element, Judge Borden relied on Anderson's proffered expert testimony regarding his STD related symptoms and the transmission rate of STDs, which the habeas court had found to be not credible. See id., 616–17 (*Borden, J.*, dissenting). Specifically, Judge Borden asserted that Anderson "was suffering from" STDs during the relevant time period. Id., 610 (*Borden, J.*, dissenting). He also explained that "the jury would have had Grady's testimony, contrary to Scholand's, that there is a transmission rate of 40 to 50 percent for each sexual contact between an infected male and a woman, and an even higher rate for a female of the age of the victim," even though the habeas court did not credit this evidence but, rather, concluded that the evidence showed only a 30 percent chance of transmission. Id., 616–17 (*Borden, J.*, dissenting). Rather

than confining his analysis to the habeas court's findings, Judge Borden disregarded the habeas court's findings and relied on testimony that the habeas court had not credited.

In a certified appeal to this court, Anderson argued that the Appellate Court majority improperly had decided the case against him. See *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 362. In his arguments, Anderson, consistent with Judge Borden's reasoning, repeatedly relied on the evidence that the habeas court had found to be not credible, namely, that he was infected with one or more STDs and that the transmission rate would have been 40 percent or higher. See *Anderson* v. *Commissioner of Correction*, Conn. Supreme Court Records & Briefs, February Term, 2013, Petitioner's Brief pp. 22–25.

In response, the respondent took issue with Anderson's and Judge Borden's reliance on testimony that the habeas court had not credited. The respondent argued that "[Judge Borden] improperly assumed that it is reasonably probable that the jury would have found Grady's testimony and interpretations of the medical records to be credible and reliable when the fact finder . . . did not." Id., Respondent's Brief p. 19. The respondent explained in his brief that "[a]n appellate court cannot retry the case or evaluate the credibility of the witnesses. . . . Rather, [it] must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas [court], as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) Id. The respondent argued that Judge Borden's dissent contravened this well established standard of review because Judge Borden "wholeheartedly credited, and essentially deferred to, the opinions and interpretations of [Anderson's] expert," which the habeas court did not credit. Id., pp. 19–20. The respondent further explained that "[a] reviewing court cannot simply choose to find credible particular evidence that the trier of fact itself did not credit and [that] is inconsistent with the trier's ultimate findings and conclusions." Id., p. 20. In support, the respondent noted that determining prejudice on the basis of new witness testimony is "not simply . . . an evaluation of the legal sufficiency of that evidence" but also requires an evaluation of "the overall credibility and persuasiveness of that evidence . . . ." Id. Consistent with our case law, the respondent went on to explain that this credibility assessment is for the habeas court to make, not a reviewing court: "[O]nly the habeas court heard and considered *all* of the evidence . . . . Unlike a reviewing court, the habeas court is able to view the evidence as it is presented, including the demeanor of the witnesses, and, thus, the habeas court is in a far better position to appreciate how a jury is

likely to hear and process that evidence . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id. The respondent acknowledged that a petitioner's evidentiary burden is lower in this context than in an ordinary criminal trial, at which proof beyond a reasonable doubt is required, or in a civil trial, at which proof by a preponderance of the evidence is required. See id., pp. 20–21. Nevertheless, the respondent explained that "the fact that the *degree* of proof is different does not mean that the proper *roles* of the habeas court and appellate court vis-á-vis the credibility, weight and ultimate persuasiveness of the evidence differ" in this context because "[the] habeas court is still in [a] position superior to an appellate court to make such an evaluation . . . ." (Emphasis in original.) Id., p. 21. In conclusion, the respondent argued that "the habeas court, sitting in a position similar to that of the jury hearing the evidence, refused to accept, at face value, the opinion of [Anderson's] expert and his interpretation of the records. . . . [T]he habeas court was in a far better position than [Judge Borden] to view the demeanor of the experts and the confidence and certainty with which they rendered their opinions. Consequently, to the extent that [Judge Borden's] conclusions rely heavily—indeed, almost entirely—on [his] deference to Grady's testimony, [Judge Borden] fails to give proper consideration to the limits of appellate review in evaluating the reasonable probability that such evidence would have persuaded the jury to [find Anderson not guilty]." Id.

This court affirmed the judgment of the Appellate Court. *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 384. We did not adopt the approach that Judge Borden had taken and we disagreed with his conclusions. See id., 378 n.7, 380 n.9. In our decision, we set forth the habeas court's findings; id., 371–72; and cited our well established standard of review that "[t]he habeas [court], as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) Id., 375. In our analysis, we upheld the habeas court's finding that Anderson's evidence failed to establish that he suffered from an STD during the time period that the assaults occurred. Id., 377–78 and n.7. We expressly disagreed with Judge Borden's conclusion to the contrary, and, in response to his arguments, we cited the habeas court's findings that contradicted his conclusion. Id., 378 n.7. Furthermore, we also decided that, "[e]ven if [it were] assume[d] that [Anderson] was suffering from nonspecific [STDs] during the relevant time frame . . . Scholand's testimony established that there was only a 30 percent chance that the victim would have acquired [an STD] from the alleged abuse." (Footnote omitted.) Id., 378–79. In reaching this conclusion, we expressly deferred to the habeas court's findings in this regard, noting that the habeas court had

the opportunity to view the testimony of the experts firsthand. Id., 379 n.8. Thus, contrary to the approach taken by Judge Borden, and consistent with the respondent's arguments, this court did not substitute its judgment for that of the habeas court regarding the credibility of Anderson's proffered expert testimony.

The majority's decision to adopt an exception to our well established standard of review, especially in light of *Anderson* and *Sanchez*, marks a significant departure from the approach that we have taken in reviewing *Strickland* and *Brady* claims and from our role as an appellate tribunal.

B

Even though the majority acknowledges the deference that we give to a habeas court's credibility assessments, stating that it "agree[s] fully" that "the general rule is one of deference, even in cases involving claims under *Brady*," the majority has decided not to follow this rule in the present case. The majority proclaims, without citing a single Connecticut case, that we can undertake a de novo review of the credibility of expert testimony "when the habeas court's assessment of the expert testimony has nothing to do with the personal credibility of the expert witness but instead is based entirely on the court's evaluation of the foundational soundness of the witness' professional opinion . . . ." This novel standard, which neither party has asked us to adopt and which even the majority concedes has no basis in our law, is wholly incompatible with our case law and our limited role as an appellate tribunal.

1

The majority contends that we may render our *own* credibility findings when the habeas court's findings were based on the "scientific underpinnings" of the expert's testimony and not the demeanor or "personal credibility" of the expert witness. Our case law does not draw such an unworkable distinction because it ignores the realities of judging credibility. When we speak of credibility, we do not refer only to a witness' *personal character* but to the broader question of whether the witness' *testimony* may be believed and given evidentiary weight. Evaluating the credibility of a witness' oral testimony is a complex process that *always* entails consideration of subjective factors like the attitude, candor and demeanor of the witness, and this assessment *cannot* be based solely on objective factors reflected in the printed record. E.g., *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 308 Conn. 719, 737, 66 A.3d 848 (2013) ("[c]redibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude" [internal quotation marks omitted]). Separating the "substance" of oral testimony from the manner in which it is communicated ignores the fact

that the meaning and import of spoken words depend on the manner in which the spoken words are relayed, and not just their substance. This is precisely why, when it comes to live testimony, "it is inappropriate to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." (Internal quotation marks omitted.) *Shelton* v. *Statewide Grievance Committee*, 277 Conn. 99, 111, 890 A.2d 104 (2006). In assessing new witness credibility in the *Strickland/Brady* prejudice context, our law thus requires that the trial court observe the testimony of the new witness *firsthand* to consider the witness' demeanor while he or she testifies. See, e.g., *Thomas* v. *Commissioner of Correction*, 141 Conn. App. 465, 472–73, 62 A.3d 534 (habeas court must have opportunity to observe testimony of petitioner's new witnesses to evaluate their credibility in determining *Strickland/Brady* prejudice), cert. denied, 308 Conn. 939, 66 A.3d 881 (2013); *Townsend* v. *Commissioner of Correction*, 116 Conn. App. 663, 668, 975 A.2d 1282 (upholding denial of habeas petition when petitioner did not present testimony of new exculpatory witness, "which the habeas court properly found was insufficient to show prejudice because there was no opportunity to evaluate the testimony or credibility of the claimed witness"), cert. denied, 293 Conn. 930, 980 A.2d 916 (2009).

Judging credibility is a complex process that requires the trier to consider the testimony in light of all of the evidence presented in a case, including other testimony. It requires consideration of not only the witness' candor, demeanor and attitude, but also any factors that the trier deems relevant to its decision, which can include, but is certainly not limited to: the witness' ability to observe and comprehend information; the beliefs, prejudices, bias and assumptions that might impact the witness' perspectives; the witness' ability to accurately recall events; the plausibility of what the witness relays; the internal consistency of the witness' testimony and consistency with other testimony and evidence; and the witness' background, training, education and experience. See, e.g., *State* v. *Reddick*, 153 Conn. App. 69, 79 n.6, 100 A.3d 439, appeal dismissed, 314 Conn. 934, 102 A.3d 85 (2014), and cert. denied, 315 Conn. 904, 104 A.3d 757 (2014); *State* v. *Guess*, 44 Conn. App. 790, 805, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998); *State* v. *Nieves*, 36 Conn. App. 546, 549, 653 A.2d 197, cert. denied, 232 Conn. 916, 655 A.2d 260 (1995); *State* v. *Jaynes*, 35 Conn. App. 541, 553–54 n.7, 645 A.2d 1060, cert. denied, 231 Conn. 928, 648 A.2d 880 (1994).

Judging credibility is no different with expert witnesses, and attempting to distinguish between decisions based on the "substance" of expert testimony and those based on the expert's demeanor is just as unworkable. Because of the nature and purpose of expert testimony,

subjective factors, including attitude, candor and demeanor, play just as great of a role in the evaluation of an expert witness' credibility. Our law allows expert opinion testimony to be admitted only when its subject matter is beyond the ordinary knowledge, comprehension and experience of the average fact finder. See, e.g., *State* v. *George*, 194 Conn. 361, 373, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). Thus, when considering expert testimony, the jury is evaluating testimony about subject matter that is outside of its knowledge, which puts the jury at a disadvantage when it comes to sizing up the soundness of the expert's scientific foundation and conclusions. When faced with conflicting expert testimony, the jury necessarily lacks firsthand knowledge with which to assess the soundness of the expert's methodology and opinions. Consequently, in deciding whether to credit an expert's testimony, a fact finder often must rely more heavily on subjective factors. As a result, our law recognizes the importance of demeanor evidence as a tool for evaluating an expert witness' credibility. "Expert testimony is considered, weighed and tested like any other evidence." *Aspiazu* v. *Orgera*, 205 Conn. 623, 634, 535 A.2d 338 (1987); see also *State* v. *Joly*, 219 Conn. 234, 243, 593 A.2d 96 (1991) ("the fact that a witness testifies as an expert does not compel the acceptance of his or her testimony as true"). "It is in the sole province of the trier of fact to evaluate expert testimony, to assess its credibility, and to assign it a proper weight." *State* v. *Jarzbek*, 204 Conn. 683, 706, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). In assessing expert testimony, the trier considers subjective factors, such as the demeanor of the expert, as well as other factors, including the expert's level of expertise, the reasonableness of how the expert reached the opinion, and the factual and scientific basis for the opinion: "The trier of fact [is] . . . entitled to consider the basis of the testimony of the expert witness. In so doing it might weigh, as it [sees] fit, his expertise, his opportunity to observe [data] and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions [that] he drew from them." *State* v. *Perez*, 182 Conn. 603, 610, 438 A.2d 1149 (1981); see also id., 609 ("[t]he trier of fact was entitled to find that the cross-examination of [the expert witness] showed his testimony to be inadequately grounded in knowledge of the defendant's condition, medical data, and expertise of interpretation"). "The acceptance or rejection of the opinions of expert witnesses is a matter peculiarly within the province of the trier of fact and its determinations will be accorded great deference by this court." (Internal quotation marks omitted.) *Johnson* v. *Healy*, 183 Conn. 514, 515–16, 440 A.2d 765 (1981). "The credibility and the weight of expert testimony is judged by the same standard [as that used to evaluate lay witness

testimony], and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, [this court does] not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26, 807 A.2d 955 (2002); see also *Connecticut Bank & Trust Co.* v. *Incendy*, 207 Conn. 15, 34, 540 A.2d 32 (1988).

The scope of our review on appeal does not change according to our perception of the basis for the trier's credibility findings. Because the trier must consider all of the evidence before it when making its credibility findings, including the witness' demeanor, it is impractical, if not impossible, for the trier—or this court—to neatly categorize or separate credibility findings on the basis of a witness' demeanor from those derived from the basis for the witness' opinions. Given the complexity of a credibility analysis, the innumerable factors that a trier considers, and the complete discretion afforded the trier to weigh these factors, it would be unreasonable to require the trier to enumerate *each* and *every* basis for its finding by describing every factor that it considered and the weight it accorded to it. For these reasons, we do not require the trial court to state every conceivable rationale for its credibility findings; we require only that the trial court state its ultimate finding of fact on the record. See Practice Book § 64-1. Even if a trial court chooses to enumerate certain reasons for its credibility findings, we *still* do not vary our scope of our review on the basis of those reasons because it is inevitable that the court considered other evidence not expressly identified in its decision. Rather, we presume that the trier considered *all* of the evidence in making its findings, and we review them only for clear error. See *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 611 n.16; *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 690–91. As a result, our standard of review does not change even when the trial or habeas court does not cite witness demeanor as a reason for its credibility findings. See *Sanchez* v. *Commissioner of Correction*, supra, 611–12; *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 372, 377–80 and nn.7–8.

Our case law belies the majority's claim to the contrary. For example, in *Sanchez*, we upheld the denial of a habeas petition when the habeas court found that the new witness testimony was not likely to be credited by a jury. See *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 611–12. The habeas court, in making its credibility finding, explained only that the witness had a criminal record and "a motive to be deceptive . . . ." (Internal quotation marks omitted.) Id., 601. Neither of these factors related to the witness' demeanor. The witness' criminal history was an objective factor that was reflected in the record. With respect to the witness' "motive to be deceptive"; (internal quotation

marks omitted) id.; we explained that this stemmed from the fact that others had implicated the witness in the crime in question, giving the witness a reason to minimize his own involvement when testifying before the habeas court. See id., 611–12. This, too, was reflected in the printed record. See id. The habeas court said *nothing* about the witness' demeanor, nor did it state that it relied on any other subjective factors in deciding not to credit the testimony. See id. Thus, we presumably were in just as good a position as the habeas court in that case to assess the witness' credibility. Nevertheless, unlike the majority's opinion in the present case, we deferred to the trial court's assessment, as our law requires, and noted that we presume that the court considered *all* of the evidence in making its finding, not just its enumerated reasons. Id., 611 n.16. We did not conduct a de novo review of the witness' credibility, and we did not suggest that our standard of review could change depending on the trial court's stated basis for a credibility finding.

Even in cases involving new expert testimony in the *Strickland/Brady* prejudice context, this court and the Appellate Court apply a deferential standard of review *without pausing* to consider whether the habeas court's findings were based on the credibility of the expert's opinion or the expert personally. See, e.g., *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 372, 377–80 and nn.7–8 (deferring, in *Strickland* prejudice analysis, to habeas court's decision not to credit petitioner's new expert testimony about disease transmission rates); *Francis* v. *Commissioner of Correction*, 142 Conn. App. 530, 540 n.5, 66 A.3d 501 (upholding denial of habeas petition and deferring, in context of *Strickland* prejudice determination based on new expert testimony, to habeas court's finding that that testimony was unreliable), cert. denied, 310 Conn. 921, 77 A.3d 141 (2013). The majority has not cited a *single case* in which we changed our standard of review because of the stated basis for the trier's credibility findings, and it cannot do so because we have never made such an unworkable distinction.

Moreover, because we cannot review live testimony firsthand, as the trier can, we are unable to consider factors such as attitude, candor and demeanor. *Kaplan* v. *Kaplan*, supra, 186 Conn. 391; see *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 611–12. Thus, when it comes to credibility issues, we are in a *worse* position than the habeas court, and, by making our own findings, we would be substituting our judgment for that of the habeas court, even though our judgment is based on only *part* of the evidence. The truth is, we can never be in the same position as the trier with respect to oral testimony and can never perform a truly de novo review on the basis of *all* of the evidence, as we require the trier to do.[14] Our review is therefore limited to testing the legal sufficiency of those findings

by assessing whether they are reasonable in light of the record. See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 611–12 and n.16; *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 375, 377–80 and nn.7–8; see also *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 125.

The facts of this case also contradict the majority's attempted distinction. The majority claims that the habeas court's credibility assessments were based solely on the "soundness" of the experts' opinions and not on the demeanor or personal credibility of any witness. This simply is not true. Because we do not require our trial or habeas courts to articulate each and every factor considered and the basis for their credibility findings, we do not know the extent to which the habeas court in the present case considered demeanor in making its findings; the habeas court was silent on this. Because we must presume that the habeas court considered all of the evidence before it, including the demeanor of the witnesses; see *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 611–12 n.16; we must presume that the habeas court based its findings, at least in part, on the demeanor and candor of the petitioner's witnesses and the demeanor and testimony of *any other* witnesses who testified before the court. To be sure, it is possible that the habeas court found that an expert's demeanor weighed in favor of crediting the expert's testimony. But, given the habeas court's silence, it is not possible for us to say either that the habeas court did not consider witness candor, attitude and demeanor, or that it did not base its findings on these factors. Indeed, if it were true that the habeas court did *not* consider the witnesses' demeanor and personal character in considering the credibility of their testimony, then the habeas court would have been acting improperly. We, of course, do not presume error; we presume that the habeas court considered these factors in the absence of a clear indication to the contrary, which the habeas court did not give in this case.

Assessing the credibility of the petitioner's expert witnesses also required the habeas court to consider the credibility of other witnesses who testified at the habeas hearing. The majority claims that the habeas court's assessment was "not dependent on any underlying factual findings requiring the . . . court's firsthand observation and determination of the credibility or reliability of other witnesses." Yet, the habeas court heard evidence that the conclusions of one of the petitioner's experts, John DeHaan, *directly conflicted* with the eyewitness observations of Stephen Igoe, another fire expert who, unlike the petitioner's experts, investigated the actual fire scene in person and within hours of the fire. The habeas court noted that, as part of Igoe's investigation, he conducted a test burn of the materials in the couch where the fire was supposedly ignited and principally burned.[15] He determined that the couch

materials burned "very, very slowly . . . ." Despite Igoe's testimony before the habeas court about his first-hand observations of the materials involved in the fire, the petitioner's expert, DeHaan, who was *not* present at the fire scene, disagreed with Igoe's observations. Although DeHaan did not inspect the actual fire scene or the materials in the couch, and did not conduct a test burn, he based his burn time estimate on a contrary conclusion that the couch burned "very rapidly." Assessing the soundness of DeHaan's opinion that the fire burned very rapidly therefore required the habeas court to evaluate the credibility of Igoe's contrary observation that the fire burned very slowly. Thus, the habeas court's findings necessarily depended on "underlying factual findings requiring the . . . court's firsthand observation and determination of the credibility or reliability of other witnesses."

Because the trier must consider *all* evidence when making credibility findings, it is not possible to separate those findings based on the soundness of an expert's opinion from those based on an assessment of the expert personally. The majority thus attempts to draw a dichotomy that is not grounded in reality and is not supported by our law or the facts of this case. If the majority nevertheless wants to draw this contrived distinction, then the appropriate remedy in this circumstance is to order an articulation from the habeas court rather than to make assumptions based on the habeas court's silence, which tells us nothing when we have never previously required the habeas court to speak on this matter or given any significance to this silence.

### 2

Even if it were possible to distinguish between credibility findings based on an expert's demeanor and those based on the substance of the testimony, our law still forbids a de novo review of such credibility findings by this court. In support of its new standard, the majority proclaims that we "need not, and will not," defer to the trial court on any issue "when we are in as good a position as the trial court to decide the issue . . . ." Text accompanying footnote 63 of the majority opinion. But this court has never before embraced such a sweeping principle, and we certainly have not accepted it as a valid excuse to retry a case by making our own findings from the record. To the contrary, this court has *repeatedly rejected* this tired suggestion because it is inconsistent with the constitutional limits on our role as an appellate tribunal. See, e.g., *Styles* v. *Tyler*, supra, 64 Conn. 442. For example, we have determined that we cannot make our own credibility assessments, even when the trial court's assessment was based on a video recording of a witness' statement that we could view in the same manner as the trial court. See *Skakel* v. *State*, supra, 295 Conn. 470, 486–87 and n.25. In *Skakel*, the author of the majority opinion in the present case,

in dissent, posited that there was "no occasion for . . . deference" to the trial court's credibility determination when it was based on the viewing of a video recording and thus not otherwise based on subjective factors, including the witness' demeanor. Id., 631 (*Palmer, J.*, dissenting). The majority rejected this assertion, noting that "this court . . . squarely has rejected" the notion that we may apply a less deferential standard of review even to a credibility decision "that is not predicated on an assessment of the witness' demeanor." Id., 487 n.25.

We have also uniformly rejected this notion in other contexts. For instance, in *State* v. *Lawrence*, 282 Conn. 141, 156–57, 920 A.2d 236 (2007), we declined to undertake a de novo review of a trial court's credibility determination that was based on that court's review of a printed transcript, rather than an in-court assessment of the witness' testimony. Although the defendant in *Lawrence* claimed that deference to the trial court's findings was unwarranted "because the trial court did not have the opportunity to observe [the witness'] conduct, demeanor and attitude on the witness stand"; id., 156; we declined to adopt this approach as it "misapprehends the fundamental distinction between the function of the fact finder, which is to make credibility determinations and to find facts, and the function of the appellate tribunal, which is to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) Id. We explained that, "[*i*]*n light of our limited function, it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations.*" (Emphasis added.) Id., 157. In *Besade* v. *Interstate Security Services*, 212 Conn. 441, 562 A.2d 1086 (1989), we rejected a claim that this court need not defer to a trial court's findings, even when the evidence before the court was "largely documentary" and the findings were not based on "a personal appraisal" of any live testimony. Id., 448; see id., 449 ("[w]e have not heretofore distinguished between documentary and testimonial evidence in defining the role of appellate tribunals in reviewing findings of fact").

Even in the context of expert testimony, this court has consistently declined to adopt a less deferential standard of review when the trial court's findings were based solely on the substance of the expert testimony and documentary evidence, not on witness demeanor. See, e.g., *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22 (noting that our review of fact and credibility findings is limited to clear error review, and, "[b]eyond that, we will not go"). And over one-half century ago, we explained in *Morgan* v. *Hill*, 139 Conn. 159, 90 A.2d 641 (1952), that "[t]he case [on appeal] presents another of countless instances [in which] an unsuccessful litigant, still unconvinced, renews in this court his previous, fruitless effort to

discredit the evidence submitted by his opponent. Nothing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. . . . *It was the prerogative of the [trial] referee to accept the testimony of the plaintiff's experts rather than that offered by the defendant's*." (Citations omitted; emphasis added.) Id., 161.

3

We defer to the trial court's findings even when demeanor is not at issue because the reasons for our deference are not limited to practical considerations alone. Even though we often cite, as the reason for our deference, a trial court's unique ability to assess evidence firsthand and in the context in which it is presented, our scope of review is mandated by the constitutional limits on our appellate jurisdiction, which prohibit this court from resolving disputed questions of fact or determining the credit that may be given to a witness' testimony.[16] Since this court's inception, its jurisdiction has been limited to reviewing issues of law, whereas jurisdiction to resolve issues of fact and credibility has been vested exclusively in the trial court. See, e.g., *Styles* v. *Tyler*, supra, 64 Conn. 444–50. This division of responsibility is not merely for convenience; it is intended to prevent the "evil" that would result from having a single court act as final arbiter of issues of fact in addition to issues of law. Id., 446, 449. Prior to the creation of this court, the Superior Court acted as the court of last resort for issues of fact, whereas the legislature held the power to finally resolve questions of law. Id., 446. The legislature created the Supreme Court of Errors in 1784; id.; and its "jurisdiction was confined to questions of law arising upon facts found by the Superior Court [which is] the court of last resort for all matters of fact." Id., 447. This separation intentionally paralleled the "distinction as drawn under our system of jurisprudence . . . between facts that the trial court must find from the testimony, and the application of the principles of law in reaching a judgment based [on] such facts." Id., 454.

The founders of our state's judicial system divided the jurisdiction of our courts to ensure that no single court could act as the final arbiter for both issues of fact and issues of law, which they feared could destroy the rule of law: "[T]he administration of justice is not safe when the court of last resort for the settlement of the law, in the exercise of an absolute and final power, can render judgment on the facts and law so intermingled that its decision is not simply the declaration of the law but may become the arbitration of the case." Id., 449. Vesting one court with jurisdiction to finally decide matters of fact and law will leave the results in our cases to the discretion of judges who can choose both the facts and the law that will govern a case, and

"nothing but . . . human wisdom and firmness on the part of its judges can prevent a court exercising such . . . jurisdiction from eventually becoming one great arbitration that would [e]ngulf all the courts of law, and sovereign discretion [not the principles of law] would be the rule of decision." (Internal quotation marks omitted.) Id. Such an expansive "discretion of a judge is the law of tyrants; it is always unknown; it is different in different men; it is casual, and depends [on] constitution, temper and passion. In the best, it is [often times] caprice; and in the worst, it is every vice, folly, and passion to which human nature is liable!" (Internal quotation marks omitted.) *State* v. *Danforth*, 3 Conn. 112, 122 (1819). Thus, "confining the jurisdiction of [this] court . . . to the settlement of rules of law" alone was "[t]he most significant feature in the establishment of the court"; *Styles* v. *Tyler*, supra, 64 Conn. 447; and reflected "a principle deemed vital to our judicial system." Id., 448.

Mindful of these concerns, the drafters of the 1818 constitution adopted the existing divide between the jurisdiction of the Superior Court and the Supreme Court of Errors. See id., 449–50; see also Conn. Const., art. V, § 1. In doing so, they "expressed the conviction of the people that a jurisdiction of mixed law and fact vested in any court of last resort, exercising a supreme and uncontrolled power, was inconsistent with a sound system of jurisprudence and was dangerous to the administration of justice . . . ." *Styles* v. *Tyler*, supra, 64 Conn. 451. The Superior Court thus holds "supreme jurisdiction" to try cases and settle disputes of fact, whereas the Supreme Court of Errors, which subsequently became this court, holds "supreme and final jurisdiction" to settle issues of law. Id., 450. This court thus "is not a supreme court for all purposes, but a supreme court only for the correction of errors in law . . . ." Id. Accordingly, "it is the exclusive province of the trial court to judge . . . the credi[bility] of witnesses." *Dexter Yarn Co.* v. *American Fabrics Co.*, supra, 102 Conn. 539.

The constitutional limits on fact-finding and assessing credibility cannot be circumvented merely by rebranding the nature of our inquiry, as the majority attempts to do in the present case. "[S]ettling the credi[bility] of witnesses, weighing the evidence, ascertaining the truth from conflicting or incongruous evidential facts, is a function within the exclusive jurisdiction of the trial court under our system of law, and is not reviewable by [this court]. . . .

"Our jurisdiction cannot be enlarged, to permit the retrial of facts by us, by legislative enactment or rules of court . . . and obviously not by the consent or acquiescence of the parties. [When] an appeal involves a request for the correction of a finding . . . by a weighing of the evidence, it is patent that the real sub-

stance of such a proceeding is nothing but a retrial of pure questions of fact settled by the final judgment of the Superior Court. Its actual nature cannot be changed by calling it a correction of the finding." (Citations omitted; internal quotation marks omitted.) Id., 537–38; see also *Thresher* v. *Dyer*, 69 Conn. 404, 410, 37 A. 979 (1897); *Atwater* v. *Morning News Co.*, 67 Conn. 504, 525–27, 34 A. 865 (1896). "A [retrial on] the testimony . . . *by whatever name it may be called*, is a trial of the facts in that cause, whether its effect be limited to ordering a new trial, or extends to the rendition of a final judgment on the facts so adjudicated; and is inconsistent with the primary distinction drawn by the [c]onstitution, between the jurisdiction original and appellate of courts for the full trial and adjudication of causes, and the jurisdiction of a court of last resort for correcting errors in law which may have intervened in the course of a trial. . . . The Superior Court is the court of last resort for such purpose. . . . Such a principle embedded in the [c]onstitution . . . cannot be evaded through any plan for accomplishing by a mere form of words the very evils it was adopted to prevent." (Emphasis added.) *Atwater* v. *Morning News Co.*, supra, 526–27. Consequently, "there can . . . be no doubt but that the determination by this court, upon the evidence, of questions of pure fact, for the mere purpose of rendering its own judgment upon issues of fact, is inconsistent with [this court's] jurisdiction, and clearly obnoxious to that underlying principle which holds the security of the citizen and the certainty of the law as best served by confining the supreme and uncontrolled power vested in a court of last resort for the correction of errors to the determination of principles of law." *Styles* v. *Tyler*, supra, 64 Conn. 456.[17]

The jurisdictional limits that prevent us from assessing credibility do not relax, even when a defendant's claim implicates rights guaranteed by the federal constitution. Although we have explained that we have a duty to scrupulously review the record in reviewing a constitutional claim, we have made clear that this review does not allow this court to engage in its own credibility assessments: "Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014) (deference in context of reviewing fourth amendment claim); see also *Sanchez* v. *Commissioner of Cor-*

*rection,* supra, 314 Conn. 604, 606 (deference in context of reviewing *Strickland* claim); *State* v. *Krijger*, 313 Conn. 434, 447–48, 97 A.3d 946 (2014) (deference in context of reviewing first amendment claim); *State* v. *Mullins*, 288 Conn. 345, 365, 952 A.2d 784 (2008) (deference in context of reviewing fifth amendment self-incrimination claim); *State* v. *Santiago*, 245 Conn. 301, 312–13, 715 A.2d 1 (1998) (deference in context of reviewing *Brady* claim).

Contrary to the Chief Justice's assertions in her concurring opinion, our deference to the trier's role as the arbiter of credibility does not depend on whether the trier is making "ultimate" credibility findings, and we have never changed our standard of review on this basis. The Chief Justice suggests, and the majority agrees, that we need not defer to the trial court when it is not acting as the "ultimate" fact finder but is merely assessing the probability that a jury will credit testimony. This contrived distinction appears *nowhere* in our law, which presumably explains why neither the Chief Justice nor the majority has offered any citations to support it. Indeed, we rejected this attempted distinction in the *Strickland/Brady* context just months ago in *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 585, a unanimous decision in which every member of the panel in the present case joined. In *Sanchez*, we indicated that there was no difference between our treatment of an assessment of whether a jury would likely credit new witness testimony and our treatment of a traditional credibility finding. See id., 602 n.12, 611–12 and n.16. In doing so, we expressly agreed with the Appellate Court majority's rejection of Judge Sheldon's suggestion in his dissenting opinion in the Appellate Court that we could review this assessment de novo.[18] Id.

Furthermore, we do not engage in de novo credibility assessments even in other, similar contexts requiring a predictive judgment about how a jury might weigh testimony. For example, we defer to the trial court's assessment of new witness credibility in the context of claims for a new trial based on newly discovered evidence, which also require a trial court to assess the likelihood that a jury will credit the new testimony and reach a different result than that reached at the original criminal trial. See, e.g., *Shabazz* v. *State*, 259 Conn. 811, 827–28, 792 A.2d 797 (2002); see also *Adams* v. *State*, 259 Conn. 831, 842, 792 A.2d 809 (2002) ("[i]n deciding a petition for a new trial . . . the trial court sits as fact finder in place of the jury and examines the newly discovered evidence independently, in order to determine whether it is likely to result in a different verdict in the event of a retrial"). Even though newly discovered evidence claims do not require what the Chief Justice deems to be an "ultimate" finding but, rather, an assessment of how a jury might evaluate new evidence, we do not substitute our judgment for the trial court's judg-

ment. This is true even when the new evidence is of a type that does not call for any firsthand assessment of demeanor such that we could evaluate the evidence in the same manner as a trial court. See *Skakel* v. *State*, supra, 295 Conn. 487 n.25 (video-recorded statement from witness).

Claims for prejudgment remedies also require a trial court to consider the probability that a party will succeed, which includes a predictive assessment of how a jury might gauge witness credibility. See, e.g., *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 137–38, 143, 943 A.2d 406 (2008). A prejudgment remedy proceeding requires a trial court " 'to determine probable success' " by the moving party; id., 142; and is "not contemplated to be a full scale trial on the merits . . . ." Id., 143. Even though the trial court's credibility assessments in these proceedings are merely probabilistic, we review them only for clear error. Id. ("judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role" [internal quotation marks omitted]); see also *Augeri* v. *C. F. Wooding Co.*, 173 Conn. 426, 428, 378 A.2d 538 (1977) (noting that we defer to trial court's credibility findings even though prejudgment remedy proceedings do not "ultimately" decide parties' claims).[19]

Accordingly, the long-standing limits on our jurisdiction require that "[w]e must accept . . . the trial court's decision [on] the question of credibility. It is beyond our province to weigh evidence and decide questions of this character." *Swist* v. *Swist*, 107 Conn. 484, 487, 140 A. 820 (1928). We repeatedly have explained, in a variety of contexts, that "[a]n appellate court must defer to the trier of fact's assessment of credibility . . . ." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 155. "The evaluation of the credibility of witnesses is left to the sound discretion of the trial court." *State* v. *Jones*, 193 Conn. 70, 80, 475 A.2d 1087 (1984). "We cannot retry the facts or pass [on] the credibility of the witnesses." (Internal quotation marks omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 220. "[N]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony." (Internal quotation marks omitted.) *Kervick* v. *Silver Hill Hospital*, 309 Conn. 688, 717, 72 A.3d 1044 (2013). "In light of our limited function, it would be improper for this court to supplant its credibility determinations for those of the fact finder," even if the basis for those findings is reflected in "the cold printed record . . . ." *State* v. *Lawrence*, supra, 157.[20]

4

The majority, attempting to justify its new standard, quotes at length from a case from another jurisdiction, but that case is entirely inapposite because we have

already squarely rejected the principle underlying its holding. Given the overwhelming authority from *this state* expressly rejecting the principles underlying the majority's new standard, it is no surprise that the majority seeks support, not from a Connecticut case, but from a single case from an intermediate appellate court in *Indiana*, namely, *Bunch* v. *State*, 964 N.E.2d 274 (Ind. App.), trans. denied, 971 N.E.2d 1215 (Ind. 2012). But whether appellate courts in Indiana can review the credibility of expert testimony de novo says nothing about whether a Connecticut appellate court can do so, especially in light of the restraints imposed by our state constitution. Also, contrary to the majority's assertion that the Indiana case is "factually and procedurally indistinguishable," the portion of the case that the majority cites at length does not even involve a *Brady* or *Strickland* claim but an Indiana state law claim for a new trial based on newly discovered evidence. Id., 288–89, 293–97. The court in *Bunch* applied a de novo standard of review because it felt it was in as a good a position as the trial court to decide credibility on the basis of a review of transcripts of new witness testimony presented live to the trial court when the trial court's assessment was not based on witness demeanor.[21] See id., 293. We rejected this principle in *Skakel* when we held that this court could *not* perform a de novo credibility review of newly discovered evidence, even when the trial court's analysis did not involve a firsthand assessment of witness demeanor. *Skakel* v. *State*, supra, 295 Conn. 487 n.25 (declining to conduct de novo review of findings concerning witness' video-recorded statement because we do not vary our scope of review even for findings "not predicated on an assessment of the witness' demeanor"). We have also made clear that credibility assessments of new witness testimony in the context of newly discovered evidence claims cannot be made by reviewing a printed transcript of a witness' testimony. *Adams* v. *State*, supra, 259 Conn. 844 (credibility of newly discovered evidence "must be decided on the basis of the trial court's own assessment of credibility, not on the type of cold transcript utilized by the trial court"); cf. *State* v. *Lawrence*, supra, 282 Conn. 156–57. If we cannot make credibility judgments even when the trial court bases its assessment on a video recording or a printed record, it is preposterous to conclude that we may do so when, as in the present case, the court based its findings on live testimony. The majority, justifying its reliance on *Bunch*, explains that newly discovered evidence claims require "exactly the same analysis as claims under *Brady* and *Strickland*, as they entail the same considerations." Text accompanying footnote 62 of the majority opinion. Given this acknowledgment by the majority, it seems to me that we should look to our *own* law on newly discovered evidence claims, which *rejects* the majority's approach, rather than to rely on a lone case from another state to justify a new standard

of review for this case.[22]

5

The majority's creation of its new standard carries with it the danger of unwarranted expansion of appellate powers. In support of its new standard, the majority sweepingly proclaims that an appellate tribunal "need not, and will not," defer to a trial court on any issue whenever "we are in as good a position as [that] court to decide the issue . . . ." Text accompanying footnote 64 of the majority opinion. It does so without any citation or attempt to reconcile this statement with our prior decisions and constitutional principles, all of which expressly reject this assertion. See, e.g., *Anderson* v. *Commissioner of Correction*, supra, 313 Conn. 375, 377–80 and nn.7–8; *Skakel* v. *State*, supra, 295 Conn. 487 n.25; *State* v. *Lawrence*, supra, 282 Conn. 156–57. Relying on this principle, the majority suggests that we can review credibility assessments de novo whenever this court deems itself as fit as the trial court to do so. Based on the majority's assertions that its new standard applies to the type of predictive fact-finding characteristically reserved for *Brady* claims, it applies at least to new witness testimony in the context of *Strickland*, *Brady* and newly discovered evidence claims, and perhaps also to prejudgment remedy proceedings. In light of the number of *Strickland*, *Brady* and newly discovered evidence claims based on new witness testimony, the majority's new standard would increase the burden on our appellate tribunals and litigants by requiring them to retry issues settled by the habeas court. Under the majority's new standard, appellate courts would have not only the ability, but also the *duty* to undertake a de novo review of witness credibility when the criteria for applying the majority's new standard are met. This new standard would require our appellate courts to make their own credibility findings whenever the habeas court does not base its decision on subjective factors, like candor or demeanor. It would also require litigants to retry these issues in our appellate courts by briefing factual disputes in addition to the legal issues. If the appellate tribunal can make its own credibility findings in this context, the habeas court's purpose in these cases will be relegated to little more than receiving and recording the evidence, and then issuing a recommended ruling for the appellate tribunal to mull over, accept or cast aside, as it sees fit.

Recognizing the dangers associated with the new standard it applies in this case, the majority immediately sets out to contain the damage done by trying to prevent its application in future cases. The majority acknowledges that we must defer to the trier's credibility assessments but nevertheless asserts that its holding is but a narrow exception to our ordinary standard of review. The majority acknowledges that its approach is unprecedented in our law but claims that this is because "we

previously have not had a case on all fours with this one." Text accompanying footnote 61 of the majority opinion. It characterizes its new standard as a "limited exception" necessitated by the "uncommon" and "highly unusual" circumstances of the present case, and explains that it will apply only in the "rare" cases that are "indistinguishable in any material respect from this one." But the majority does not explain exactly what makes *this* case so exceptional. Nor does it explain why this case requires us to depart from decades of cases explaining that credibility is a matter for the trier without regard to the purported basis for the trier's findings. Moreover, the majority does not square its claim that the holding in this case is limited with its broad pronouncement that we will perform a de novo review of *any* issue whenever we deem ourselves to be in as good a position as the trial court to do so—a principle that we heretofore have *rejected* unequivocally. If it is true that we may review *any* question de novo *whenever* we deem ourselves to be as well situated as the trial court, how can the majority simultaneously claim that its holding in this case is limited to the facts of this case? Why is this case so exceptional?

## II

## REVIEWABILITY

The majority's decision to undertake a de novo review of witness credibility injects issues into the case that have not been raised or briefed by the litigants, which ordinarily requires us to allow the parties to submit supplemental briefing on before we go sifting through the record in order to make our own credibility findings. The majority, on its own initiative, has changed our law by adopting a de novo review of credibility findings and has proceeded to undertake that review even though neither party raised any arguments in this court or in the Appellate Court with respect to the habeas court's credibility findings, and neither party has asked us to change our standard of review to allow this court to conduct its own credibility assessments. As a result, neither party has weighed in on the propriety of the majority's new standard of review or the underlying fact and credibility disputes that the majority resolves.

The principal issue actually raised in the present case is one of law. It concerns the petitioner's burden to establish the credibility of new evidence in order to prove *Strickland/Brady* prejudice and the habeas court's role in determining whether the petitioner has met that burden. Although the habeas court did not credit the petitioner's expert testimony, the Appellate Court decided that credibility of the new witnesses should be left to a new jury, not to the habeas court, a conclusion that the respondent has challenged on appeal to this court. None of the parties discussed, either in their briefs or at oral argument, whether an appellate tribunal can make its *own* credibility assess-

ments. The arguments in this court regarding the proper legal standard assumed the propriety of leaving credibility assessments entirely to a new jury, and focused on the extent of the habeas court's role in judging new witness credibility and the standard by which the habeas court should determine whether a new jury should hear the new testimony at a new trial.

In addition, despite the habeas court's decision not to credit the burn time evidence from the petitioner's experts, the petitioner did not raise any claim attacking those findings before the Appellate Court or before this court. The respondent noted the absence of any such claim in his brief to this court and at oral argument, and the petitioner did not object to these repeated assertions. Indeed, in his brief to the Appellate Court, the petitioner *agreed* with the habeas court's conclusion that his evidence could not credibly establish the fire's burn time to a degree that would bolster his alibi defense. The habeas court concluded as follows: "What is clear from all the evidence in the record, the original trial testimony, crime scene photographs, reports, and the expert testimony presented to [the habeas] court [concerning] the fire, is that *the precise time the fire was set cannot be determined*. At best, a range is established that includes that time period of 6:15 p.m. to [7] p.m. (fire could have been burning between 5:45 p.m. and 7:55 p.m.), when [Karen] Martin cannot account for the petitioner's whereabouts and does not provide an alibi for him." (Emphasis added.) The petitioner, tracking the habeas court's language, agreed, stating "*it is true that the experts could not determine the exact amount of time the fire burned*" and that "*the fire's burn time could not be precisely determined . . . .*" (Emphasis added.) Rather than attacking the habeas court's findings, the petitioner has instead argued that the Appellate Court properly concluded that it is up to a jury, not the habeas court, to determine whether to credit his experts, each of whom was qualified to render an opinion. Accordingly, neither party has raised any claim of error based on the habeas court's credibility findings. Nor has either party suggested that an *appellate court* should make its *own* credibility assessments.

Failure of a party to raise a claim on appeal results in abandonment. See, e.g., *State* v. *Cyrus*, 111 Conn. App. 482, 487, 959 A.2d 1054 (2008), aff'd, 297 Conn. 829, 1 A.3d 59 (2010). In the absence of any challenge to the habeas court's credibility findings, or any argument by the parties that we should make our own findings, the issues that the majority decides are not properly before this court. See, e.g., *State* v. *Crumpton*, 202 Conn. 224, 231–32, 520 A.2d 226 (1987).

To dampen the criticism that it receives from the dissenting justices for deciding unraised issues, the majority declares that the issues it decides were already decided by the Appellate Court and thus are not new

to this appeal. To that end, the majority repeatedly asserts that the Appellate Court performed its *own* de novo assessment of the credibility of the petitioner's new expert testimony and that the Appellate Court rendered its *own* finding that there was a reasonable probability that a jury would credit it. The majority quotes at length from the Appellate Court's decision but missing from its quotation is any de novo assessment of the "soundness" of the expert testimony or credibility findings by the Appellate Court. The majority has not provided its readers the courtesy of a citation to what page or pages this review and these findings appear in the Connecticut Appellate Reports. The fact is, the Appellate Court did *not* perform its own de novo credibility assessment, nor did it make its own findings.

Any question on this point is dispelled by a fair reading of the Appellate Court's decision. Absent from the Appellate Court's decision is any mention that it is undertaking a de novo review of the credibility of expert testimony. Nor does the Appellate Court give any justification for such a review. Given that such a review by an appellate tribunal in this state would be unprecedented, at least until today, it would be surprising for the Appellate Court to sail into uncharted waters without at least warning its readers that it is doing so. Also missing from the Appellate Court's decision are any findings resulting from its purported de novo credibility review. Instead, the Appellate Court repeatedly conditioned its prejudice analysis by stating that the petitioner's evidence, "*if believed by the jury*," could lead to a different result. (Emphasis added.) *Lapointe* v. *Commissioner of Correction*, supra, 138 Conn. App. 479; see also id., 476–77. I, for one, would expect that, if the Appellate Court were performing its own unprecedented de novo review of witness credibility, it would at least state its findings on the record, as our trial courts are required to do. Rather than making its own findings, the Appellate Court stated that assessing the credibility of the expert witnesses was a task best left to a jury: "If the Ludlow note had been disclosed to trial counsel, however, *it would have been the responsibility of the jury and not the court to weigh the credibility of the arson experts.* Whether the burn time evidence, which was so critical in buttressing [the petitioner's] alibi defense, raised a reasonable doubt as to the petitioner's guilt *would best be a determination left to the jury and not a habeas court.*" (Emphasis added.) Id., 476–77 n.17. Furthermore, neither party argued in the Appellate Court that it should be performing its own de novo credibility review. Nor did the parties brief the issue of whether such a review by an appellate tribunal would be appropriate. As I previously mentioned, the petitioner did not challenge the habeas court's findings, but, instead, the parties argued over the proper standard to be applied by the habeas court.

In light of these statements by the Appellate Court,

I simply do not agree with the majority's conclusion that the Appellate Court performed its own credibility assessment. By leaving the credibility question to a *jury*, the Appellate Court freed *any court* considering the petitioner's *Strickland/Brady* claim of any need to inquire into the credibility of the expert testimony or the need to make any findings of its own. Deciding that a *jury* and not a *habeas court* should assess credibility in this context is markedly different from deciding that an *appellate tribunal* may do so. Both the habeas court and a jury properly may serve as the trier of fact and arbiter of credibility, whereas an appellate tribunal, except for the majority in the present case, may not. Consequently, the considerations that are needed to resolve these two issues are wholly distinct. I thus disagree that the Appellate Court would undertake such an unprecedented review without even stating that it was doing so or attempting to justify such an analysis.

Because neither party has claimed, either in this court or the Appellate Court, that an appellate tribunal can properly make its own credibility assessments, or that the Appellate Court in this case did so, we have no briefing from the parties concerning whether such an analysis by an appellate tribunal is proper. The lack of a de novo review by the Appellate Court, and any suggestion by the parties that such a review is proper, is fatal to the majority's claim that the parties raised and briefed arguments about the propriety and the merits of such a review by an appellate tribunal. Neither party has briefed the issue of whether an appellate tribunal may properly render its own credibility findings in this context. The lack of any argument on this issue stands in stark contrast to the briefing in *Anderson*, in which the respondent expressly argued that an appellate tribunal could not render its own credibility findings, a position that we ultimately followed in that case. Instead, the respondent argues in this case precisely what I have explained in this opinion, namely, that the Appellate Court improperly disregarded the habeas court's role, left the credibility assessment to a jury, and then reached its materiality determination by "speculating on the basis of what 'could have' happened 'if' certain evidence had been believed. . . . In saying that jurors could have reached a conclusion if they believed certain testimony, the Appellate Court said no more than that this was possible or conceivable," which is insufficient to establish *Strickland/Brady* prejudice. (Citations omitted.) Whether credibility assessments properly may be left to a new jury, rather than a habeas court, is a much different issue than whether an appellate tribunal may make its own credibility assessment. In light of the respondent's briefing on this issue in *Anderson*, I find it hard to believe that the respondent would remain silent on this same issue in the present case if it were truly presented to us in this appeal.

Moreover, because neither party made any claim of

error regarding the *merits* of the credibility questions put into issue by the majority, neither party has provided briefing on that topic. The only discussion of the credibility of the experts comes from a single, half page *footnote* in the respondent's brief. Most tellingly, that footnote was appended to a sentence in the text that explained that the petitioner had *not* raised any claim of error concerning the habeas court's credibility findings at any point during the appeal. Furthermore, in that footnote, the respondent explained that the record did not permit a finding of *clear error*; he mentioned *nothing* about what an appellate tribunal could find if it performed a de novo review. It would be naive to think that, if the respondent truly had notice that *this court* would conduct its *own* de novo review of the credibility of new witness testimony, the respondent would have dedicated only a *single footnote* to this fact intensive inquiry, especially considering that such an analysis by *this court* is unprecedented in our law and requires consideration of numerous days of testimony and exhibits from the petitioner's habeas hearing and the criminal trial. The respondent's decision to relegate any discussion of expert witness credibility to a footnote and to couch it in terms of a clear error analysis is proof of only one thing: the parties did not raise this issue and were not on notice that this court might perform its own credibility assessment. Even the petitioner recognized that the respondent was arguing not that the Appellate Court performed a de novo review, but that the Appellate Court acted improperly by deciding that the credibility assessment was a "jury issue" and not an issue for the habeas court. The majority's uninvited change to our law has therefore left us with a task that we have never before undertaken and without any guidance from the parties as to how we should resolve their dispute.

Before we alter our well established and heretofore unquestioned standards of review and take the unprecedented step of rendering our own credibility findings, we must at least provide the parties with an opportunity to submit supplemental briefs on these issues. In *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 123, we determined that we may, sua sponte, consider issues not preserved or raised by the parties, subject to certain restrictions. See id., 128, 161–64. We explained that a reviewing court may, but is not required to, review "issues involving plain error or constitutional error sua sponte, as long as the court provides an opportunity for the parties to be heard by way of supplemental briefing and the other threshold conditions for review are satisfied." Id., 161–62. "Of course, as we have explained in connection with a reviewing court's consideration of a claim raised for the first time on appeal, if a party objecting to the reviewing court's sua sponte consideration of the claim can demonstrate that it

would be unfairly prejudiced by such consideration, it would be inappropriate for the appellate tribunal to consider such a claim. Furthermore, once the objecting party makes a colorable showing of unfair prejudice, the burden shifts to the other party to establish that the objecting party will suffer no such prejudice. . . . [W]e also reiterate that our system is an adversarial one in which the burden ordinarily is on the parties to frame the issues, and the presumption is that issues not raised by the parties are deemed waived." Id., 163–64. The majority has not explained what considerations led it to address issues not raised by the parties. Even if a de novo review of the habeas court's findings might be warranted, the principles delineated in *Blumberg* require this court to first assess whether addressing the issue would be unfairly prejudicial to the respondent. This prejudice analysis is a necessary predicate to addressing an unraised issue. Even if we find no prejudice to the respondent in addressing this claim, we must *still* give the parties an opportunity to address the issues that the majority decides.

Reaching this issue on our own and without any input from the parties harms the parties and undermines the fairness of our judicial process. Due process compels us to give the parties notice and an opportunity to be heard. The record in this case is voluminous. It consists of more than eighty volumes of transcripts with thousands of pages of testimony from a probable cause hearing, suppression hearing, three habeas hearings, and a lengthy criminal trial. There are hundreds of exhibits from these proceedings. The significance of certain evidence may not be obvious to us from our own, unguided review of such a voluminous record. The parties have greater knowledge of the evidence in the record and how it got there. They also have a more complete perspective of the context in which evidence was presented and its import. Facts viewed in isolation are not as powerful as facts woven into a coherent and compelling argument. That is the purpose of briefing. By denying the parties notice and a chance to brief the issue that the court decides, we may be silencing valid arguments not obvious from our own review. Even if that briefing does not change the majority's conclusions, the losing party deserves the solace of knowing that it has been fairly heard.

The harm to the respondent that results from a denial of notice and the right to be heard is not just theoretical—it is demonstrated in the majority opinion. In several places in its opinion, the majority correctly observes that the respondent was silent about the credibility of the petitioner's experts, noting, for example, that "the respondent makes no attempt to defend the . . . habeas court's assertion that there was a material difference" in the substance of the burn time experts' testimony. But this silence is significant *only* to demonstrate that the respondent was not afforded the notice

that he needed to address this unraised issue. Does one seriously doubt that, if the respondent had been afforded notice that the habeas court's findings were under attack, he might have addressed these claims before this court rather than remaining silent on these points? The respondent briefed his case on the understanding that the petitioner had not challenged the habeas court's findings in the Appellate Court or in this court, and specifically explained in his brief that the petitioner had not raised such a claim. The majority is thus deciding an issue that was not raised and is holding the respondent's silence on that issue against him.

The harm caused by silencing the respondent, as a representative of the state, is especially acute in this case. The majority's decision to order a new criminal trial could well be the functional equivalent of a directed judgment of acquittal. The events underlying this case occurred more than one quarter century ago. Memories may have faded, remaining evidence may be of a questionable quality, and key witnesses, some of whom were advanced in years at the time of the petitioner's criminal trial, might have passed away. The majority's opinion leaves the state in the difficult position of having to retry this case long after the events at issue occurred. Certainly, if the petitioner's conviction was obtained unfairly, then he deserves to have his conviction vacated. But the state, through the respondent, is, *at a bare minimum*, entitled to be heard before we charge its appointed representatives with withholding exculpatory evidence and vacate the petitioner's conviction on that basis.

For these reasons, the majority should either decide only the issues raised by the parties or seek additional briefing in light of its decision to address unraised issues.

### III

### THE MAJORITY'S CREDIBILITY FINDINGS

Even if I assume, for the sake of argument, that we can review the habeas court's findings de novo, I still am not persuaded that the petitioner is entitled to a new criminal trial. The majority finds the petitioner's new expert testimony to be credible after a purportedly de novo review of the record. But it spends much of its analysis on a lengthy diatribe against the habeas court's findings—an unnecessary endeavor in light of the majority's assertion that no deference to those findings is warranted. Indeed, rather than looking for evidence to prove credibility, the majority seems to presume that the new testimony is credible and searches for reasons to discredit it. The majority begins by simply attacking the habeas court's findings. Then, after determining that the habeas court's "stated reasons for discrediting the burn time estimates of [the petitioner's experts] are baseless," the majority deter-

mines whether there is some "other apparent reason why a jury would be apt to discredit their testimony." The majority finds no such reason but does so after briefly considering only the experts' qualifications and the fact that the respondent has not challenged their credibility. This is insufficient to establish credibility. First, determining that the habeas court's reasons underlying its credibility determinations were incorrect does not necessarily establish that the testimony of the new experts is credible. Second, an expert's qualifications to render an opinion, while necessary to secure admission of expert testimony, do not automatically prove that there is a reasonable probability that it will be credited; that determination requires a review of *all* of the evidence and testimony presented at the habeas trial, which the majority does not perform. Third, as I mentioned previously, the respondent's silence on this issue is hardly a basis for making a credibility finding, given that this issue was not raised. The respondent could not seriously be expected to know that this court would raise this issue sua sponte after relying on an inapposite case from another jurisdiction. Furthermore, by looking to the respondent for criticisms of the petitioner's experts, and finding the new testimony credible in their absence, the majority improperly shifts the burden of proof to the respondent.

Even if I assume that the petitioner had challenged the habeas court's credibility findings, my review of the record persuades me that the findings were correct. My review reveals that the new expert testimony simply is not reliable because it lacks adequate foundations in fact and science, and because the opinion testimony of the petitioner's two experts substantially conflicted in material respects. First, as the petitioner conceded in the Appellate Court, his own experts' testimony demonstrated that the fire's burn time cannot be reliably determined to any helpful degree. The petitioner's experts, who were hired more than one decade after the fire, relied on speculation and unproven methods to reach their burn time estimates. They also relied on factual assumptions that were refuted by eyewitness testimony. Additionally, the petitioner's experts disagreed with each other about key data relevant to determining the fire's burn time and conceded that their inability to analyze the fire scene firsthand could impact their conclusions. Second, other fire investigators, including the only two investigators that examined the actual fire scene, testified that the fire could have burned for several minutes to several hours—a time period that does not support the petitioner's alibi—and further testified that there was not enough data available to reliably develop a more specific determination with respect to the fire's burn time.

Without a valid and reliable factual and scientific foundation, the petitioner's expert testimony would not even be admissible, let alone credible. See, e.g., *State*

v. *Porter*, 241 Conn. 57, 74, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); *State* v. *John*, 210 Conn. 652, 677, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). To be admissible, an expert's opinion must have a basis in facts that are supported by the evidence; the factual basis for an expert's opinion may not be based on speculation. See *Viera* v. *Cohen*, 283 Conn. 412, 449, 927 A.2d 843 (2007). "In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . . [When] the factual basis of an expert opinion is challenged . . . the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value." (Citations omitted; internal quotation marks omitted.) *State* v. *John*, supra, 677. Thus, without an adequate basis in fact, an expert's opinion cannot be admitted into evidence, let alone credited.[23] See, e.g., id. Additionally, the methodology that an expert uses to reach an opinion on scientific issues must be scientifically valid. See *State* v. *Porter*, supra, 83–87. An expert's personal experience alone, even if extensive, is not sufficient to establish the scientific validity of the expert's methodology. *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 263, 9 A.3d 364 (2010). With these principles in mind, I turn to my review of the expert testimony presented at the petitioner's habeas hearing and the testimony and exhibits from the criminal trial relating to the testimony of the expert witnesses.

A

Testimony from the Petitioner's Experts

1

Turning first to the testimony of DeHaan, I note that the record demonstrates that his estimate was unreliable because the principal factual underpinnings that DeHaan relied on in support of his burn time estimate are contradicted by eyewitness testimony, as well as his own testimony, and thus are not supported by the evidence. DeHaan estimated that the fire burned for at least twenty-five minutes but no more than sixty minutes. DeHaan based his estimate on two key factual assertions. First, DeHaan assumed that the fire on the couch "burned very readily," quickly consuming the available oxygen in the apartment, and then was reduced to a smolder. Second, DeHaan estimated that temperatures inside the apartment were about 400 degrees[24] when the first firefighter on the scene, Michael Tomkunas, kicked in the front door because the high heat in the apartment prevented him from entering it. But each of these two critical foundations for DeHaan's burn time estimate is contradicted by testimony from eyewitnesses, and not supported by any other evidence.

First, DeHaan's belief that the fire on the couch "burned very readily" is contrary to the observations of a fire investigator who actually witnessed the speed at which the couch burned. Igoe, the state fire marshal who originally investigated the fire, testified at the criminal trial and again before the habeas court. Igoe arrived at the scene within a few hours of the fire and remained on the scene for about five hours to conduct his investigation. During his investigation, Igoe examined the couch where the fire originated and the inside of the victim's apartment to assess the damage and the fire's burn pattern. He also conducted a test burn of the couch to determine how it burned by burning the actual material from the couch in an oxygen rich environment. Igoe testified at the habeas hearing that, even with plenty of oxygen, the couch material "burned *very, very slowly* and it emitted heavy black smoke." (Emphasis added.) In his report issued shortly after the fire, Igoe explained: "Examination of the living room couch leads this investigator to conclude that *the burning to the couch was the slow smoldering type burning and not the rapid burning which occurs with some materials*." (Emphasis added.)

In reaching his own conclusions, however, DeHaan simply rejected these eyewitness observations about the speed at which the couch burned, even though DeHaan had neither examined the couch materials nor witnessed the speed at which they burn. The petitioner, in his posttrial brief, acknowledged this rejection, explaining that "DeHaan disagreed with Igoe substantively on the fire's characteristics, most particularly that it was a slow burning fire." DeHaan believed, from looking at photographs of the couch, that it was made of a material that burned rapidly and that it would not have been treated with flame retardant. But the materials involved in the fire were discarded or destroyed long before DeHaan became involved in the case. DeHaan thus did not examine the couch firsthand, could not undertake an analysis of its materials to determine their composition, and did not personally witness or conduct any test burns of the couch's materials. Nor did he explain how his theory was consistent with the results of Igoe's burn test. DeHaan's dismissal of Igoe's testimony, despite DeHaan's lack of any personal knowledge of how it burned, places the factual basis for his conclusions in direct conflict with eyewitness evidence presented to the habeas court.

Second, the factual basis for DeHaan's estimate of the temperature in the apartment when Tomkunas first arrived is contradicted by Tomkunas' testimony from the criminal trial. DeHaan based his estimate of the entry level temperature on his understanding that Tomkunas could not enter the apartment even though he suspected someone was inside. Tomkunas' inability to enter the apartment suggested to DeHaan that tempera-

tures were between 300 and 400 degrees when Tomkunas first arrived, with the temperatures most likely closer to 400 degrees. This led DeHaan to conclude that the fire could not have been started more than one hour before Tomkunas tried to enter, or else the high temperatures would have dissipated and Tomkunas would not have been deterred from entering the victim's apartment.

The majority relies heavily on DeHaan's understanding that Tomkunas could not enter the apartment because of the heat to call into question the habeas court's reliance on the testimony of the respondent's expert, Robert Corry. According to the majority, DeHaan testified "that the temperature inside the hot gas layer was likely between 300 and 400 degrees when Tomkunas entered the apartment. DeHaan explained that this estimate was based, in part, on Tomkunas' testimony at the petitioner's criminal trial that, when he arrived at the victim's apartment, the outside of the front door was hot to the touch, and 'the temperatures and . . . hot gases he encountered at near floor level were untenable, and *he couldn't go in, even though he suspected there was a victim inside.*' " (Emphasis in original.) DeHaan also testified that, if the temperature had been lower than 400 degrees, "Tomkunas would not have necessarily been dissuaded from entering." DeHaan's burn time conclusion, therefore, was based on his understanding that Tomkunas could not enter the apartment at all because of the high temperatures and that Tomkunas entered the apartment only *after* the firefighters vented it, allowing the heat to escape. The habeas court discredited DeHaan's estimate of entry level temperatures based on Corry's testimony that Tomkunas entered the victim's apartment before it was vented and was not burned, indicating that temperatures could not have been as high as DeHaan had suggested. Contrary to DeHaan's understanding that Tomkunas "couldn't go in[to]" the apartment because of the heat until after it was vented, Tomkunas testified that he *was* able to enter the apartment when he first arrived and *before* it was vented. Tomkunas, a volunteer firefighter, was driving in his personal vehicle less than one mile from the victim's apartment when he received a dispatch reporting the fire. Tomkunas, who was on a date at the time, did not have any protective gear or breathing apparatus with him. Nevertheless, he drove directly to the victim's apartment and arrived there about one minute after the dispatch. The petitioner directed Tomkunas to the apartment, and he went straight to the front door and kicked it in. Tomkunas was met with what he called a "wall of smoke." It was nighttime, and the apartment was filled with dense smoke, making it difficult for Tomkunas to see inside the apartment. Despite these conditions, Tomkunas was able to enter the apartment on his first attempt. He dropped to his knees in an attempt to stay below as

much of the smoke as possible and crawled in. He was able to crawl about eight feet into the apartment and within only three feet of the burning couch. Tomkunas saw a small flame on the still smoldering couch. Tomkunas estimated that he was in the apartment for about fifteen to twenty seconds before the heat and smoke conditions convinced him that rescue efforts would be "a lot easier" if the apartment was vented. Tomkunas crawled back out the front door and asked another firefighter who had arrived to open the back door of the apartment to allow the heat and smoke to escape. Tomkunas immediately crawled back into the apartment to continue his search. He estimated that he was outside of the apartment for less than five seconds before reentering. During his second entry into the apartment, Tomkunas again crawled to within only three feet of the burning couch. This time, he found the victim and removed her from the apartment with the help of another firefighter. At no time during his testimony did he say that he was prevented from entering the apartment as a result of the heat. DeHaan's assertion that the high heat prevented Tomkunas from being able to enter the apartment altogether is, therefore, at odds with Tomkunas' actual testimony.

In addition, Tomkunas' ability to remain in the apartment for fifteen to twenty seconds before it was vented and without suffering any burns completely contradicts DeHaan's claim that the apartment was close to 400 degrees when Tomkunas first kicked in the door. Corry testified that, according to data from the National Fire Protection Association, a person with uncovered skin will sustain first or second degree burns when exposed to 212 degree temperatures for fifteen seconds; burns will occur in even less time at higher temperatures. Although DeHaan estimated that Tomkunas would have experienced temperatures near 400 degrees "to the bare skin," Tomkunas did not sustain any burns or injuries from the heat or smoke on either of the two occasions that he entered the apartment.[25]

Tomkunas's testimony directly contradicts DeHaan's and the majority's understanding that the 400 degree heat prevented Tomkunas from even entering the apartment. The habeas court discredited DeHaan's testimony in part because it credited Corry's testimony that entry level temperatures could not have been close to 400 degrees as DeHaan estimated because Tomkunas was able to enter the apartment without suffering any burns. The majority concludes, however, that this finding "lacks support in the record." According to the majority, the approximately 400 degree temperatures prevented Tomkunas from even entering the apartment before it was vented, and that was why Tomkunas did not get burned. The majority explains that "Tomkunas had testified . . . that the heat and smoke *prevented* him from entering the apartment when . . . he first attempted to do so," and it criticizes Corry for "simply . . . refus-

[ing] to accept" this fact. (Emphasis in original.) But Tomkunas' testimony makes clear that he *did* enter the apartment on his first attempt and remained in there for about fifteen to twenty seconds without suffering any burns.

I also note that Corry's opinion received additional support from Corry's own interviews of Tomkunas. As part of his investigation of the fire, Corry personally interviewed Tomkunas twice about his actions on the night of the fire and the heat conditions that Tomkunas encountered. Corry testified during the habeas hearing that, "when [he] asked [Tomkunas] to compare [the heat he experienced upon entering] to something that he was familiar with, he said at most it was similar to entering a sauna, which would be about 150 degrees to 190 [degrees]." DeHaan, on the other hand, did not speak to Tomkunas or even attempt to contact him; he instead claims to have relied on Tomkunas' trial testimony, which, as I explained previously, is inconsistent with DeHaan's understanding of the conditions that Tomkunas experienced.

DeHaan's assumptions in support of his estimates of entry level temperatures are thus completely refuted by Tomkunas' testimony. We do not know what impact, if any, Tomkunas' ability to enter the apartment had on DeHaan's conclusions because DeHaan's stated understanding of Tomkunas' actions simply does not line up with Tomkunas' testimony. When, as in the present case, an expert's opinion lacks a valid basis in fact, it is nothing more than speculation and may not be admitted into evidence, and, as a result, cannot be credited. See, e.g., *State* v. *John*, supra, 210 Conn. 677.

In addition, DeHaan's belief that entry level temperatures were too high for Tomkunas even to enter the apartment conflicts with DeHaan's own testimony about the fire's energy level. DeHaan testified that the fire would have produced a relatively small amount of heat and would have been approachable, even at its maximum intensity. DeHaan explained that the fire's intensity "would probably be about the same as an average fireplace fire. It would be pumping a lot of heat into this room, *but not so much that you couldn't— you couldn't approach it, for instance, to try to extinguish it, and if you were there at the time . . . it reached its maximum . . . .*"[26] (Emphasis added.) DeHaan did not explain how the fire could have been approachable at its maximum intensity but unapproachable when Tomkunas tried to enter the apartment, which, according to DeHaan, likely occurred after the fire passed its peak and the apartment had begun to cool.[27]

DeHaan's unsupported and conflicting testimony fully supports the habeas court's conclusion that DeHaan's burn time estimate was too speculative to be reliable, rendering it inadmissible.

Turning next to the testimony of the petitioner's other burn time expert, Gerard Kelder, Jr., I am persuaded that the record supports a finding that his estimate was also unreliable. The petitioner did not provide any evidence to show that Kelder used scientifically valid methods to investigate the fire, rendering his testimony not credible and inadmissible.

Kelder testified that he developed his burn time estimate principally by reviewing the fire damage depicted in photographs and a video recording. During the habeas hearing, the respondent's attorney asked Kelder what scientific method he followed to investigate the fire. Kelder initially testified that he relied on his personal experience and that his procedures tracked those described in chapter four of the National Fire Protection Association's Publication 921, a widely used fire investigation guide.[28] After being shown a recent edition of Publication 921, Kelder said that he had an older edition and would have to review the publication to recall its basic procedures. After reviewing it, Kelder changed his testimony about his method and admitted that he did *not* follow those procedures to investigate the fire but used his own procedure based on his personal experience instead.[29]

Kelder did not explain whether the method he contrived from his own personal experience was a scientifically valid and reliable method for determining a fire's burn time. Kelder acknowledged that his "estimate of the ignition time of the fire was based largely on the amount of damage that [he had] observed," but there was no other testimony to establish that a review of fire damage through photographs and a video recording of the scene is a valid and reliable method for determining how long a fire burned. Additionally, when describing his method, Kelder stated that the method he used to determine the burn time was based on his experience in "determining [the] *cause* and *origin*" of a fire; he said nothing about his experience or method for determining *how long* a fire burned. (Emphasis added.) The only evidence in the record about whether this method was valid came from Corry, who testified that examining photographs of fire damage was not a viable method for determining a fire's burn time.

The respondent attacked Kelder's testimony before the habeas court on this very basis. In his posttrial brief, the respondent argued that Kelder "could identify no scientific principle that would support his assertion that he [could] determine the duration of the fire simply by viewing photographs of the damage that it caused. Indeed, when Kelder's testimony is considered in its entirety, it becomes clear that it was nothing more than pseudo-scientific babbling. His conclusion, therefore, should not be credited . . . ." Not surprisingly, the

petitioner, in his posttrial brief, cited to Kelder's testimony only once.

A court must preclude an expert's opinion when there is no evidence in the record to support the validity of the expert's methods other than the expert's own "ipse dixit" that those methods are valid and reliable; a witness' personal experience is not enough. *Klein* v. *Norwalk Hospital*, supra, 299 Conn. 263; see also id., 262–63 ("[T]he defendant made no showing that [the expert witness'] methodology had been subjected to peer review, nor was [the witness] able to identify a likely rate of error for his chosen methodology. [Although] neither of these determinations is a talismanic requirement for satisfaction of the *Porter* requirements, their absence is . . . determinative of the inadequacy of the defendant's proof of the methodology's reliability. . . . Without these or any other meaningful indicia of reliability, [the witness'] conclusion was without basis in an assuredly reliable methodology; *without any stated support for its reliability other than his own personal expertise, it was nothing more than his ipse dixit.*" [Citation omitted; emphasis added.]).

The habeas court in the present case was fully justified in concluding that Kelder's opinion would be excluded from a criminal trial altogether. See id., 263 ("[n]othing . . . requires a . . . court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert" [internal quotation marks omitted]). The petitioner's failure to present facts to establish the validity and reliability of Kelder's method would render his testimony not credible and inadmissible.

3

Other than the inherent unreliability of their estimates, Kelder and DeHaan disagreed with each other about key data points relevant to a determination of the fire's burn time, including the maximum temperature in the apartment, the temperature inside the apartment when Tomkunas first arrived, and the materials in the couch where the fire principally burned.

At the habeas hearing, Kelder testified that the maximum temperature in the apartment as a result of the fire would have been between 1800 to 2000 degrees at ceiling level. When asked how he reached this estimate, Kelder replied, "[i]t's scientific proof." DeHaan testified, however, that the temperature in the apartment could not possibly have exceeded 400 to 450 degrees. According to DeHaan, there were a number of objects throughout the apartment, including within the hot smoke layer, that "had been affected, but not ignited," and, if the temperature had been any higher than 450 degrees, "a lot of other things would have been ignited and burned."[30]

Kelder and DeHaan also disagreed about the tempera-

ture of the apartment when Tomkunas first kicked in the front door. Each of the petitioner's experts agreed that this was an important factor in determining the fire's burn time. As I discussed previously, DeHaan estimated that the entry level temperature was about 400 degrees. Kelder, on the other hand, initially testified that "there was not a lot of heat in that room at the time [the firefighters] entered" because, if there had been, there would have been a "flashover . . . of fire from the new oxygen coming into the room" when the firefighters first opened the door.[31] Later in his testimony, however, Kelder gave an estimate of 600 to 800 degrees, which far exceeded DeHaan's estimate of both the entry level temperature and the maximum temperature that the apartment could have reached as a result of the fire. Yet, under further questioning, Kelder testified that he was "not really sure" what the entry level temperature was because he "wasn't at the fire scene," so any estimate of the entry conditions would be "an assumption on [his] part." In addition to demonstrating the inconsistent and contradictory nature of the petitioner's evidence, Kelder's testimony on this point is yet further evidence—*from the petitioner's own expert*—that DeHaan could not make a reliable estimate of the entry level temperature.

Furthermore, the petitioner's experts disagreed over whether the couch cushions were made of rubber foam or polyurethane foam, which burn at different rates, a difference that could have affected the fire's burn time. DeHaan testified that he was sure that the couch cushions were made with rapidly burning polyurethane foam, which led him to reject Igoe's eyewitness observations that the fire burned slowly. According to DeHaan, if the couch cushions were made of slower burning rubber foam, the remnants of the cushions would have appeared much differently than that depicted in the photographs, and rubber was not widely used as cushion material when the victim's couch was likely constructed.[32] Nevertheless, the petitioner's other expert, Kelder, contradicted DeHaan's opinion and concluded, instead, that the couch cushions *were* made of rubber foam, which burns relatively slowly and does not easily ignite. Like DeHaan, Kelder also based his conclusion on his review of the photographs of the couch. And, unlike DeHaan, Kelder did not dispute Igoe's report that the couch material burned "very, very, slowly . . . ." In fact, when asked whether the couch cushions could have been made from polyurethane foam, which burns more rapidly than rubber foam, Kelder testified that he was "sure" that they were not made of polyurethane. He stated: "I can tell you it wasn't polyurethane foam because, if that were the case, any type [of] poly foam like that would ignite and burn rapidly. This did not [based on] the test done by . . . Igoe."

The petitioner's experts also admitted that their late arrival to the case, as well as their resulting inability

to study the actual fire scene in person, could affect the validity of their conclusions. Neither Kelder nor DeHaan investigated the actual fire scene at the time of the fire. They were hired more than one decade after the fire to formulate burn time estimates based only on a review of photographs, a video recording and the testimony of certain witnesses. But the photographs and video recording were taken after emergency personnel had disturbed the original fire scene. For example, photographs of the couch where the primary fire burned show the couch outside of the victim's apartment on the lawn, even though all experts agree that the couch was in the living room at the time of the fire. Emergency personnel moved the couch outside before the first fire investigators arrived on the scene and before any photographs of the scene were taken. Moreover, neither Kelder nor DeHaan interviewed any of the witnesses to the fire, and neither of them personally examined or analyzed any of the materials involved in the fire.

Kelder acknowledged that important information about the conditions contributing to the fire's duration was unavailable to him because he joined the case long after the fire occurred. Kelder explained that he developed his burn time estimate by looking at photographs, a video recording and a diagram of the scene, and by reviewing certain testimony. He did not do anything further to gather additional information to help his investigation—for example, by interviewing witnesses—and explained that he was not asked to do this. Nevertheless, he agreed that it would have been a good investigative practice to do so, if he had been able to investigate the actual fire scene in "1987 versus 2000 . . . ." He also acknowledged that his inability to review, firsthand, the actual fire scene and materials involved in the fire prevented him from using standard fire investigation methods. When asked whether he knew the ignition temperatures of the materials involved in the fire, Kelder conceded that he "would have to test the materials" but that he "didn't have that availability" and therefore could not conduct his own tests. And when Kelder was asked whether it would be important for his investigation to determine exactly what type of material was involved in the fire, he answered: "Yes, if I had the availability of being at the scene, I think I would have sent it to the lab and determine what components were in it." Kelder also explained: "I could not make that determination. I wasn't at the scene." Finally, Kelder also acknowledged that it would have been "a good investigative practice to try to determine what the temperatures were when the firefighters entered the apartment" but that he could not do so because he "wasn't at the fire scene."

In addition, DeHaan acknowledged the limited data available to him could impact his conclusions. When DeHaan was asked at the habeas hearing whether there

was "anything [he] could have learned by examining any items that were retained from the fire," he explained: "If the [couch] had been retained, yes, that would have been useful to physically examine it and specifically identify the fabrics and filler rather than by photographs." Although DeHaan based his burn time opinion primarily on his estimate of the temperature that Tomkunas was exposed to when he first arrived at the apartment, DeHaan acknowledged that he was able to estimate that temperature "[o]nly very approximately . . . ." And, in his written report, DeHaan concluded that, "[d]ue to the *limited data available* as to the insulation and ventilation conditions existing in [the victim's apartment], *it is not possible to predict the postfire duration of high temperatures.*" (Emphasis added.) Nevertheless, DeHaan ultimately based his opinion on an estimate of the postfire duration of high temperatures. When confronted during the habeas hearing with this apparent inconsistency, DeHaan admitted that it is not possible to determine the fire's duration "[w]ith any accuracy, that's right, with precise accuracy, I should say," and explained that his estimate "was *a very general conclusion* that that was the—that was the time frame" based on a "*prediction* of the ventilation conditions in the room." (Emphasis added.)

The petitioner had the burden of proving the elements necessary to prevail on his *Brady* claim, which required him to demonstrate prejudice by providing reliable burn time evidence in support of his alibi defense. The unfounded, speculative and contradictory nature of the testimony of the petitioner's burn time experts leads me to conclude that the petitioner's evidence is not reliable. Consequently, there is no reasonable probability that it would have been credited.

B

Testimony from Other Experts

Apart from the faulty testimony of the petitioner's own experts, the habeas court also heard testimony from three other fire experts. Their testimony reinforced what the petitioner's experts acknowledged: that investigators lacked the data needed to make a reliable burn time estimate, including proper measures of temperature in the apartment during the fire, ventilation conditions, and the materials in the couch where the fire primarily burned.

As I noted previously, the habeas court heard testimony from Igoe, who investigated the actual fire scene firsthand. On the basis of his analysis of the fire scene and his observations of the couch and its burn rate, he concluded that the primary fire started on the couch and burned "very, very slowly . . . ." Igoe testified that, given the slow burn rate, the time the fire took to spread after ignition could have varied depending on ventilation and insulation conditions in the apartment.

He explained, however, that he had difficulty assessing actual conditions at the time of the fire because the scene had been disturbed by emergency personnel. Igoe noted that the "[c]onditions of the [apartment] were horrible" and that the apartment was "a mess" after the fire. On the basis of his firsthand observations, Igoe determined that the slow burning fire could have burned for several minutes to several hours, depending on the exact conditions and materials in the objects that burned. Igoe testified that the only information he would feel comfortable using to determine the fire's duration would be eyewitness testimony about the fire's start time, which did not help narrow the window of time within which the fire could have started.

The habeas court also heard from Joseph Roy, another fire investigator from the state fire marshal's office, who assisted Igoe in his investigation at the scene. Roy's testimony supported Igoe's conclusion. Roy testified that any reliable estimate of the fire's burn time would require additional facts and scientific analysis of the materials involved. That analysis requires a lab analysis of the combustible materials in the home to determine how long those materials could burn, an analysis that was not performed in this case.

The respondent's expert, Corry, also testified that the burn time could not be reliably determined. Corry agreed with Igoe that the fire could have burned for several minutes to several hours, depending on the exact conditions at the time of the fire, which are not known to *any* of the investigators. Corry reached his conclusions on the basis of his own observations about the insulation conditions of the actual apartment. Of the three hired experts, Corry is the only one who visited the actual fire scene. He noted that the victim's apartment had remained vacant since the incident and still smelled strongly of smoke. He observed the insulation properties of the apartment and interviewed a maintenance employee at the apartment complex who had worked there since before the fire. The maintenance employee explained that the original door had been cleaned and left in place but that the windows had been replaced after the fire with the same type that had previously been installed. From his observations, he concluded that the apartment was well insulated. He also noted that photographs of the scene show limited smoke damage on the outside of the apartment, which led him to conclude that the apartment was not well ventilated at the time of the fire.

Corry concluded that the fire's burn time could not be determined to a reasonable degree of probability. Corry believed that the couch burned slowly after ignition. According to Corry, burn patterns indicated that objects on the couch, along with a lack of ventilation, inhibited the spread of the fire. Like the other experts, Corry opined that the fire eventually consumed avail-

able oxygen and reduced to a smolder. Given the lack of knowledge of the type of materials involved in the fire and the exact ventilation conditions at the time of the fire, Corry concluded that "[i]t's very difficult to say [with any] degree of certainty" how long the fire lasted. Corry opined that the fire could have smoldered for some time, even with a relatively small amount of ventilation bringing in fresh oxygen to sustain the fire.[33] Because Corry believed that the apartment was well insulated, he believed it could have retained heat and smoke from the fire for a "significant period of time . . . ." For these reasons, Corry testified that the fire could have lasted anywhere from several minutes to several hours. Because of a lack of data needed to render a more specific and scientifically reliable burn time estimate, Corry determined, similar to Igoe, that one would have to rely on eyewitness testimony to determine the time frame within which the fire likely started.[34] In this case, the eyewitness testimony, together with Corry's conclusion that the fire could have burned for several hours, led Corry to conclude the fire could have started anytime during a window of about two hours or more, which the habeas court determined would not support the petitioner's alibi.

This is not a case in which a fact finder, presented with equally compelling but divergent expert testimony, simply chose to credit one expert over others. The petitioner's unreliable burn time evidence and the testimony from other experts convinces me that there is not a reasonable probability that a jury would credit the testimony. How the majority can conclude that the habeas court's findings are "baseless" in light of this evidence is beyond me.

Without any credible burn time evidence to weigh against the original trial evidence, the petitioner cannot establish prejudice under *Strickland* and *Brady*. On the record, I disagree that we can conclude, as a matter of law on appeal, that the petitioner has met his burden.[35]

IV

CONCLUSION

For the foregoing reasons, I cannot join in the majority's decision to uphold the Appellate Court's decision to order a new trial for the petitioner. I therefore would reverse the Appellate Court's judgment and remand the case with direction to affirm the habeas court's judgment denying the habeas petition.

Accordingly, I respectfully dissent.

[1] All references in this opinion to the habeas court are to the habeas court, *Nazzaro, J.*, or what was the third of three habeas courts in a series of habeas proceedings involving the petitioner, Richard Lapointe.

[2] *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[3] *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[4] Beside the testimony of his experts, the petitioner's other new evidence included only the Ludlow note and testimony from Karen Martin, his former spouse, who did not testify at the petitioner's criminal trial. This other new

evidence was not enough to undermine the verdict at the petitioner's criminal trial in the absence of valid evidence of the fire's burn time to support the petitioner's alibi. Although the petitioner argued that the "30–40 mins. Poss." notation in the Ludlow note was an expert opinion of the fire's burn time, it was never connected to any expert. Ludlow, the author of the note, was not sure whether it was an opinion from fire investigators, who denied they gave any such opinions, or a question that Ludlow wanted to ask. Thus, the Ludlow note may not even constitute *Brady* material. That issue, however, is not before the court. As for Karen Martin's testimony, the habeas court found that it did not provide the petitioner with a complete alibi because she could not account for the petitioner's whereabouts for the entire night in question.

[5] The majority asserts that my view of the Appellate Court's decision "verges on insulting . . . ." I do not insult the opinions of others; rather, I leave it to the reader to determine whether my view of the Appellate Court's decision is correct. I note, however, that my interpretation of the Appellate Court's approach in this case is not "ludicrous," as the majority suggests. Rather, the Appellate Court's approach bears significant resemblance to a harmless error analysis applied to evidentiary claims. In a harmless error analysis, an appellate tribunal determines whether the absence of certain evidence prejudiced the offering party at trial. It requires an appellate tribunal to decide "whether the evidence, *if believed* by the jury, likely would have produced a different result." (Emphasis in original.) *Adams* v. *State*, 259 Conn. 831, 842, 792 A.2d 809 (2002). In applying this test, "[t]he reviewing court thus abstains from drawing any independent conclusions regarding the credibility of the evidence, leaving that responsibility to the jury [at] a new trial, who may observe, firsthand, the witness' conduct, demeanor and attitude." Id. Although the harmless error analysis does not apply in the *Strickland/Brady* prejudice context; see *Small* v. *Commissioner of Correction*, 286 Conn. 707, 731, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008); interpreting the Appellate Court's analysis in this case as something akin to a harmless error analysis is not insulting given that the harmless error test is routinely used by appellate tribunals to assess prejudice stemming from the absence of evidence at the original trial, an issue similar to that presented by the *Strickland* prejudice element. What would be insulting to the Appellate Court is to presume that it acted as a fact finder by retrying credibility issues settled in the habeas court, an analysis never before undertaken by an appellate tribunal in this state that is unsupported by our existing jurisprudence and forbidden by our constitution.

[6] In light of the respondent's argument that the Appellate Court reached its decision by hypothesizing about what a jury could find, assuming that a jury chose to credit the new testimony, I am perplexed by the majority's assertion that the respondent made no such argument.

[7] We have recognized a limited exception to this rule when the trial court that considers the defendant's *Strickland* or *Brady* claim presided over the original trial. In that situation, we give some deference to the trial court's assessment of the impact of the alleged violation on the original trial evidence. *State* v. *Ortiz*, supra, 280 Conn. 721–22.

[8] For this reason, the Appellate Court's assertion that credibility assessments must be left to a new jury and not to the habeas court is incorrect. See *Lapointe* v. *Commissioner of Correction*, supra, 138 Conn. App. 476–77 n.17. It is the habeas court, not a jury, that must decide the petitioner's *Strickland/Brady* claim. The Appellate Court's decision to relieve the habeas court of its obligation to assess credibility and to leave the issue entirely to a jury does not recognize that both the habeas court and a new jury have a role in judging credibility, though their respective roles are different. The habeas court must make a threshold credibility assessment of new witness testimony to decide whether a petitioner has established a right to a new trial under *Strickland* or *Brady*. If a new trial is warranted, and the state retries the case, then a jury must assess the new testimony in deciding guilt or innocence.

[9] See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 603, 611 (deferring to habeas court's finding that "a jury was unlikely to have found [the petitioner's new witnesses] credible" when "the habeas court's finding in this regard [was] not clearly erroneous"); *Anderson* v. *Commissioner of Correction*, 313 Conn. 360, 375, 380, 98 A.3d 23 (2014) (deferring to habeas court's refusal to credit new expert testimony), cert. denied sub nom. *Anderson* v. *Semple*, ___ U.S. ___ (83 U.S.L.W. 3678, February 23, 2015); *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 688, 690

(deferring to habeas court's findings that petitioner's new alibi witnesses were "credible and compelling" after concluding that habeas court's finding was not clearly erroneous); *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 510–11, 523–26 (deferring to habeas court's finding that petitioner's new witnesses were credible); *Francis* v. *Commissioner of Correction*, 142 Conn. App. 530, 540 n.5, 66 A.3d 501 (noting that deference is given to credibility determinations by habeas court and deferring to habeas court's finding that petitioner's new expert's opinion was not " 'particularly reliable' "), cert. denied, 310 Conn. 921, 77 A.3d 141 (2013); *Smith* v. *Commissioner of Correction*, 141 Conn. App. 626, 631–33, 62 A.3d 554 (upholding as not clearly erroneous habeas court's finding that petitioner's new witnesses lacked credibility, rendering their testimony " 'unimpressive' " and " 'useless' "), cert. denied, 308 Conn. 947, 67 A.3d 290 (2013); *Williams* v. *Commissioner of Correction*, 41 Conn. App. 515, 521–23, 677 A.2d 1 (1996) (deferring to habeas court's finding that petitioner's new witness testimony was " 'unworthy of belief' "), appeal dismissed, 240 Conn. 547, 692 A.2d 1231 (1997); *Siano* v. *Warden*, 31 Conn. App. 94, 103, 623 A.2d 1035 (upholding habeas court's decision to grant habeas petition on basis of counsel's failure to call expert witness when habeas court "had the opportunity to observe [the expert's] demeanor, appearance, and ability to relate and communicate facts, and found that he made an excellent witness"), cert. denied, 226 Conn. 910, 628 A.2d 984 (1993); see also *Doehrer* v. *Commissioner of Correction*, 68 Conn. App. 774, 784–85, 795 A.2d 548 (deferring to habeas court's decision not to credit uncontradicted testimony of petitioner's expert witness), cert. denied, 260 Conn. 924, 797 A.2d 520 (2002).

[10] I agree with the majority's statement in footnote 38 of its opinion that the proper standard for assessing credibility of new witness testimony in this context is whether "there is a reasonable probability of the jury having credited the . . . testimony . . . ." I therefore interpret any statement in the majority opinion about whether a jury reasonably could credit the new testimony as requiring a showing that there is a reasonable probability of the jury having credited the new testimony.

[11] See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 612 ("the habeas court was in the best position to observe [the new witness'] conduct, demeanor and attitude while [he was] testifying"); *Thomas* v. *Commissioner of Correction*, 141 Conn. App. 465, 472–73, 62 A.3d 534 (habeas court must have opportunity to hear testimony of petitioner's new witnesses to evaluate their credibility in determining *Strickland/Brady* prejudice), cert. denied, 308 Conn. 939, 66 A.3d 881 (2013); *Townsend* v. *Commissioner of Correction*, 116 Conn. App. 663, 668, 975 A.2d 1282 (upholding denial of habeas petition when petitioner did not present testimony of new exculpatory witness, "which the habeas court properly found was insufficient to show prejudice because there was no opportunity to evaluate the testimony or credibility of the claimed witness"), cert. denied, 293 Conn. 930, 980 A.2d 916 (2009).

[12] See, e.g., *Thomas* v. *Commissioner of Correction*, 141 Conn. App. 465, 472–73, 62 A.3d 534 (habeas court must have opportunity to hear testimony of petitioner's new witnesses to evaluate their credibility in determining *Strickland/Brady* prejudice), cert. denied, 308 Conn. 939, 66 A.3d 881 (2013); *Townsend* v. *Commissioner of Correction*, 116 Conn. App. 663, 668, 975 A.2d 1282 (upholding denial of habeas petition when petitioner did not present testimony of new exculpatory witness, "which the habeas court properly found was insufficient to show prejudice because there was no opportunity to evaluate the testimony or credibility of the claimed witness"), cert. denied, 293 Conn. 930, 980 A.2d 916 (2009); see also *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007) ("[c]redibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude" [internal quotation marks omitted]).

[13] See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 611–12 (habeas court's credibility finding was reasonable in light of witness' relationship to petitioner, terse answers to questions, inconsistencies with testimony of other witnesses, and witness' criminal record and gang membership); *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 690–92 (deferring to habeas court's finding that new alibi testimony was credible despite impeachment evidence presented by respondent); *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 510–11, 523–26 (deferring to habeas court's finding that new witnesses were credible because they were disinterested witnesses and their testimony was fully consistent with prior statements); see also *Bowman* v. *1477 Central Avenue Apartments, Inc.*,

203 Conn. 246, 257, 524 A.2d 610 (1987) ("[when] the evidence is in conflict, its probative force is for the trier of fact to determine"); *Steinman* v. *Maier*, 179 Conn. 574, 576, 427 A.2d 828 (1980) ("[t]he sifting and weighing of evidence is peculiarly the function of the trier").

[14] Although not at issue in the present case because all witnesses in the petitioner's habeas case testified live in court, I note that, even if a party's expert witnesses submitted evidence by affidavit, rather than through live testimony, we *still* would not be in the same position as the trial court to assess credibility if other witnesses testified live before the habeas court on the same subject. Because we require a trier to consider all of the evidence presented to it in assessing credibility, it cannot make its findings by reviewing that witness' affidavit alone because the testimony of other witnesses can impact the credibility of evidence submitted by affidavit. For example, suppose a party offers the affidavit of expert A who expresses an opinion. The opposing party offers expert B and an eyewitness, who testify live and offer evidence inconsistent with the substance of A's affidavit. The trial court might discredit A's opinion on the basis of what B and the eyewitness say. Or, the trial court might nevertheless credit expert A after hearing the testimony of B and the eyewitness. Either way, the trial court's credibility assessment depends, in part, on the live testimony of other witnesses.

[15] The habeas court summarized Igoe's analysis and conclusions as follows: "Igoe concluded that the fire was slow burning because, although there was significant damage to the couch, the fire had not completely burned the wood on the back of the couch. Additionally, Igoe conducted a burn test on one of the couch cushions. The fabric ignited and burned slowly, emitting heavy, black smoke. . . .

"Depending on the specific conditions in the apartment, the oxygen supply, etc., the couch could have burned slowly and/or smoldered between several minutes or several hours, according to Igoe."

[16] In response to this argument, the majority asserts that, because "[t]he respondent has not raised a constitutional objection" to de novo review by this court, I have improperly considered our own constitutional authority in considering whether such review is proper. I am quite perplexed by this assertion.

First, the majority's position is ironic given that neither party has asked us to modify the scope of our review; put another way, the majority is improperly addressing an unraised issue. See part II of this opinion. Because the parties did not have notice that this court would change its standard of review, it is of no surprise that the respondent has not raised any objection to such a change.

Second, given that the majority has decided to reconsider and change our standard of review, I fail to understand why I am forbidden from looking at our own case law and constitution to address that very issue. In doing so, I am not raising a new issue. Rather, I am merely looking to our own authority, not cited by the parties, that bears on the issue already under consideration by the majority. Although we generally are limited to addressing only the *issues* raised by the parties, we have never suggested that we are limited to considering only the *legal authorities* cited by them. Indeed, in considering the scope of our review, the majority itself relies on authorities from other jurisdictions that neither party has cited. It thus appears to me that the majority has mistakenly confused what I am doing with a situation in which a party raises an entirely new claim for relief under our state constitution, something I have not done.

[17] In an effort to distract from its constitutional transgression, the majority calls attention to two aspects of the court's decision in *Styles* that are not in dispute. As the majority notes, the court in *Styles* recognized that we may review a trial court's factual findings; *Styles* v. *Tyler*, supra, 64 Conn. 459; but that, in doing so, we may consider only the *legal sufficiency* of those findings. This analysis, the clear error test, presents a question of law, not one of fact. The court in *Styles* also recognized that our jurisdiction extends to questions in which the issues of fact and law are so intertwined that they cannot be considered pure questions of fact; id.; and I agree that we may review de novo these so-called mixed questions of law and fact. The majority's analysis, which discusses only these two undisputed propositions, does not address our cases demonstrating that assessing the credibility of new testimony in the *Strickland/Brady* prejudice context is a question of fact, which we are constitutionally prohibited from deciding in this court. See part I A of this opinion.

[18] Additionally, I am perplexed by the Chief Justice's assertion that, by

assessing the likelihood that a jury would credit new witness testimony in the context of deciding a *Strickland/Brady* claim, a habeas court is not making an "ultimate" credibility finding. Although it is true that the habeas court is assessing how a jury might evaluate new evidence, this assessment is still an "ultimate" credibility assessment for the purposes of the *Strickland/ Brady* claim. See *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 602 n.12. The petitioner is required to make this credibility showing as a prerequisite to prevailing on a *Strickland/Brady* claim based on new witness testimony, and the failure to make this showing is dispositive of the petitioner's claim. If, as in the present case, the petitioner does not establish to the habeas court a reasonable probability that a new jury will credit the new testimony, the petitioner's *Strickland* or *Brady* claim will fail. This means that the habeas court's credibility assessment is dispositive of the petitioner's claims and that there are no further assessments to be made.

[19] To be sure, these types of probabilistic judgments may involve different burdens of proof than the preponderance standard used in civil cases or the reasonable doubt standard used in criminal cases. For example, credibility in the context of *Strickland* and *Brady* claims is evaluated under the reasonable probability standard, whereas the probable cause standard applies to prejudgment remedies. Although the burden of proof may be different from that in a full trial on the merits, the factual nature of the inquiry remains the same. See, e.g., *Sanchez* v. *Commissioner of Correction*, supra, 314 Conn. 602 n.12, 611–12 and n.16 (declining to treat credibility assessments in context of reviewing *Strickland* prejudice claim any differently from traditional credibility assessment); *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 143 (trial court assesses witness credibility in prejudgment remedy proceeding, and this court will not usurp that role).

[20] The majority claims that, in other contexts, "our appellate authority extends to actions that implicate the fact-finding function to a far greater degree than the de novo review that we exercise in the present case." In support of this assertion, the majority cites two examples, but neither of them involves fact-finding.

The first example, the clear error test, is a test of *legal* sufficiency. It is essentially a reasonableness test under which we review the record to make sure that the trier's findings are reasonably supported by the record. See, e.g., *TES Franchising, LLC* v. *Feldman*, supra, 286 Conn. 138; *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 125. Contrary to the majority's claims, the clear error test does not allow us to substitute our judgment for the trier; nor may we replace the trier's findings with our own. See *Kaplan* v. *Kaplan*, supra, 186 Conn. 391 (appellate tribunal may not reject finding "merely because the reviewing judges personally disagree with the conclusion or would have found differently had they been sitting as the [fact finder]"); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 222 ("[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached").

The majority's reference to the preservation test set forth in *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), is equally misguided. Whether a claim has been preserved is a legal question, not a factual one. E.g., *State* v. *Davis*, 311 Conn. 468, 477, 88 A.3d 445 (2014). The waiver doctrine that we applied in *Kitchens* is used to determine whether a party has sufficiently preserved a claim for appellate review. It involves the application of a legal presumption to a given set of facts. Although the application of this doctrine requires us to review the transcripts and pleadings in the record, it does not authorize us to resolve any disputed questions of fact, nor is the appellate tribunal called on to evaluate credibility. Recounting the procedural facts revealed by the record, and determining the legal consequences of those facts, is not fact-finding. See, e.g., *Dockter* v. *Slowik*, 91 Conn. App. 448, 459 and n.7, 881 A.2d 479 (procedural facts from court file are subject to judicial notice), cert. denied, 276 Conn. 919, 888 A.2d 87 (2005); *Grant* v. *Commissioner of Correction*, 87 Conn. App. 814, 817, 867 A.2d 145 ("It is well known that appellate courts do not make findings of fact. . . . Appellate courts, however, review the whole record and do not overlook material contained in the trial court's file . . . . We may take judicial notice of the contents of the court's file." [Internal quotation marks omitted.]), cert. denied, 274 Conn. 918, 879 A.2d 895 (2005); see also *State* v. *Ledbetter*, 275 Conn. 534, 568, 881 A.2d 290 (2005) (taking judicial notice is not fact-finding), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). Consequently, unless the record indisputably reveals the conditions necessary to establish waiver, we cannot resolve the ambiguity, and we do not apply the presumption. See *State* v. *Davis*, supra, 479–83 (declining to apply *Kitchens* waiver

doctrine when record did not clearly establish that counsel was afforded notice of court's intended jury instructions).

[21] Subsequent cases from the Indiana Court of Appeals appear to have limited, if not overruled, the holding in *Bunch*. Even though *Bunch* applied a de novo credibility review of live testimony, the Indiana Court of Appeals has since explained that it will *not* apply a de novo standard in cases involving live testimony, even when the credibility assessments of that testimony were based on objective factors, and that it will instead apply a clear error standard. See, e.g., *White* v. *State*, 978 N.E.2d 475, 481 (Ind. App. 2012) (referring to *Bunch* as standard for "paper" evidence and explaining that "[the] clearly erroneous standard of review would apply [when] a trial court considers evidence by live testimony"), trans. denied, 982 N.E.2d 1016 (Ind. 2013); see also *Hawkins* v. *State*, Indiana Court of Appeals, Docket No. 27A02-1301-PC-47 (Ind. App. August 20, 2013) (citing *Bunch* but declining to second-guess trial court's credibility assessment because of conflict between witness' live testimony and events that were depicted on video recording of incident at issue), trans. denied, 998 N.E.2d 213 (Ind. 2013).

[22] The majority has not cited any *Strickland/Brady* prejudice cases from any other jurisdictions that follow the principle in *Bunch*. The majority, in a footnote; see footnote 41 of the majority opinion; discusses *State* v. *Behn*, 375 N.J. Super. 409, 868 A.2d 329 (App. Div.), cert. denied, 183 N.J. 591, 874 A.2d 1108 (2005), in support of its new standard, but that case is even less helpful to the majority because it did not involve the credibility of live testimony but, rather, evidence submitted by affidavit. See id., 424–28. Like *Bunch*, *Behn* was not a *Brady* or *Strickland* case but involved a newly discovered evidence claim. Id., 414. The defendant in *Behn* based his claim on affidavits rather than on live testimony. See id., 424–28. And, although the court in *Behn* concluded that affidavits were sufficient for the defendant to prevail on his newly discovered evidence claim in New Jersey, we have rejected the notion that our trial courts can rely on printed, out-of-court statements from new witnesses to order a new trial on the basis of newly discovered evidence. *Adams* v. *State*, supra, 259 Conn. 842–46 (rejecting notion that trial court can assess credibility from transcript and remanding case to trial court for evidentiary hearing so that that court could observe new witness testimony).

My own review demonstrates that, in the *Strickland/Brady* prejudice context, other jurisdictions apply a deferential standard of review, just as we do, even with respect to new expert testimony. For example, in *Commonwealth* v. *Johnson*, 600 Pa. 329, 966 A.2d 523 (2009), the Pennsylvania Supreme Court expressly concluded that the question of new witness credibility in the *Strickland/Brady* prejudice context presented an issue of fact for the trial court. See id., 357 ("[i]ndeed, one of the primary reasons [postconviction] hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone"). That court further explained that assessing credibility in this context is "not necessarily the same thing as assessing credibility at a trial . . . but must be made with an eye to the governing standard of a 'reasonable probability' that the outcome of the trial could have been different." Id., 359. Consequently, "the question is whether the nature and quality of the evidence is such that there is a reasonable probability that the jury would have credited it . . . ." Id., 361. Pennsylvania applies the same deference to claims based on new expert testimony. See, e.g., *Commonwealth* v. *Basemore*, 560 Pa. 258, 295–96, 744 A.2d 717 (2000) (remanding *Strickland* case to postconviction court for findings as to credibility of new expert opinions). Cases from other jurisdictions are in accord. See, e.g., *Taylor* v. *State*, 62 So. 3d 1101, 1115 (Fla. 2011) (noting, with respect to *Brady* claim involving new expert testimony "the postconviction court explicitly determined to be unreliable," that "[the reviewing] court will defer to the factual findings of the postconviction court on this issue as [it] does not substitute its judgment for that of the postconviction court on questions of the credibility of witnesses and the appropriate weight to be given to the evidence"); *Green* v. *State*, 975 So. 2d 1090, 1107 (Fla. 2008) (deferring to trial court's finding with respect to *Strickland* claim that defendant's new expert testimony was not credible and denying claim on that basis); *Sochor* v. *State*, 883 So. 2d 766, 781 (Fla. 2004) (deferring, in context of *Strickland* claim, to postconviction court's decision to credit state's expert and not defendant's new expert); *Porter* v. *State*, 788 So. 2d 917, 923 (Fla.) (postconviction court has duty to assess credibility of new expert witness testimony, and appellate court will defer to this finding), cert. denied, 534 U.S. 1004, 122 S. Ct. 484, 151 L. Ed. 2d 397

(2001); *People* v. *Thomas*, 364 Ill. App. 3d 91, 103, 845 N.E.2d 842 (2006) (deferring to finding in context of *Brady* claim that defendant's new witness testimony was not credible), appeal denied, 224 Ill. 2d 590, 871 N.E.2d 60 (2007); *Howell* v. *State*, Mississippi Supreme Court, Docket No. 2013-CA-01027-SCT (Miss. October 9, 2014) (same); *Ferguson* v. *State*, 325 S.W.3d 400, 413 (Mo. App. 2010) ("[w]e must deny [the petitioner's] second *Brady* claim for a similar reason as we denied his first *Brady* claim, namely that the motion court made . . . detailed findings that the [new witness testi-mony] in question was not credible and thus was not a basis for a meritorious *Brady* claim"); *State* v. *Mau*, Wisconsin Court of Appeals, Docket No. 99-0406-CR (Wis. App. March 15, 2000) (deferring to trial court's decision, in context of *Strickland* claim, to credit state's expert and not defendant's expert); see also *United States* v. *Gary*, 341 F.3d 829, 833–34 (8th Cir. 2003) (deferring to District Court's finding in context of *Brady* claim that new witness testimony was not credible and therefore not material), cert. denied, 540 U.S. 1139, 124 S. Ct. 1128, 157 L. Ed. 2d 949 (2004).

[23] Notably, the habeas court acknowledged in its memorandum of decision that the new expert testimony likely would not be admissible because, with no reliable way to establish the fire's burn time, the new expert evidence would not be helpful to a jury and thus would not qualify for admission. The court first set forth the basic test for the admission of expert testimony: "Expert testimony generally is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) The court then concluded that, although the new testimony met the first two requirements for admission, it did not meet the third requirement because it would not be helpful: "The expert testimony on the fire and its estimated total burn time would not be in the ordinary knowledge and experience of the typical juror. While it may be relatively easy to conclude that expert testimony such as what was presented to [the] court could have been presented to the jury, the use of such experts would not have assisted the jury in knowing precisely when the fire was set."

[24] All references to temperature in this opinion are to the Fahrenheit scale.

[25] The majority criticizes my conclusion on this point by asserting that DeHaan's 400 degree estimate applied to temperatures in the "hot gas layer" and not near floor level, where Tomkunas was crawling. The majority's assertion is completely contradicted by DeHaan's testimony. DeHaan noted that Tomkunas' trial testimony described "the hot gases he encountered at near floor level" and explained that Tomkunas would have experienced 400 degree temperatures "to the bare skin." Furthermore, if it were true, as the majority suggests, that Tomkunas was *not* exposed to 300 to 400 degree temperatures because these temperatures were higher up in the apartment than the level at which Tomkunas entered, DeHaan's claim that Tomkunas could not even enter the apartment because he would have been exposed to 300 to 400 degree temperatures would make no sense.

[26] The following is the relevant portion of the discussion between the petitioner's counsel and DeHaan at the habeas hearing:

"Q. Could you determine what the level of the heat [from the fire] was?

"A. Yes. Based on the established relationship between the height of the flames and the—even against the wall and the size of the fire, I estimated that the fire never got much more than—well, it was in the order of 250 to 350 kilowatts at its maximum.

"Q. Meaning what?

* * *

"A. It would probably be about the same as an average fireplace fire. It would be pumping a lot of heat into this room, but not so much that you couldn't—you couldn't approach it, for instance, to try to extinguish it, and if you were there at the time—

"Q. At the time it was set?

"A. No. At the time it was—it reached its maximum . . . ."

[27] The majority attempts to reconcile DeHaan's testimony on this point by claiming that DeHaan, in stating that one could have approached the fire and extinguished it, meant that one could have approached the fire if one were wearing proper protective equipment. Curiously, however, no such qualification appears in DeHaan's testimony on this point—the majority has simply made this up out of whole cloth. The majority thus seems to believe that a de novo review allows it not only to make its own findings, but also to create its own facts to reconcile inconsistencies in the witness' testimony.

[28] The following is an excerpt of the respondent's counsel's cross-examina-

tion of Kelder:

"Q. What methodology did you follow in conducting this investigation?

"A. The methodology that I followed was that of my experiences for over 3000 fires, determining cause and origin for a number of years, and also my familiarity with some fire textbooks that I have in my library, and, also, I am familiar with [Publication] 921 to a lesser degree. I'm not certified, but [*chapter*] *4* [*of Publication 921*] *would indicate the same thing in* [*chapter*] *4 as I would have used in that fire.*

"Q. What is [Publication] 921?

"A. [Publication] 921 . . . is sort of like a bible for fire investigators through the National [Fire Protection] Association . . . ." (Emphasis added.)

[29] The following is the relevant portion of the cross-examination of Kelder:

"Q. Did you follow the basic methodology set forth in chapter 4 in conducting this investigation?

"A. No, I did not.

"Q. Why not?

"A. Because I based my investigation—this is a guideline that you're showing me. I base my information on more factual information, such as the photographs, the reports, the [video recording], etc. All of those things gave me a source of avenue to follow to complete my investigation based on those facts."

[30] The habeas court characterized Kelder's 1800 to 2000 degree estimate of the ceiling temperature as "wildly exaggerated" and discredited Kelder's testimony in part on this basis. The majority, however, found that there was "no factual basis" for this finding. In light of DeHaan's testimony that it is *impossible* for temperatures in the apartment to have exceeded 450 degrees, the habeas court *did* have a valid basis for rejecting this testimony, undermining the majority's own conclusions on this point. Furthermore, in view of the experts' wildly varying estimates—Corry indicated that temperatures could have reached 600 degrees—the habeas court had good reason to conclude that a reliable determination simply could not be made with the limited data available.

[31] "[A] flashover . . . occurs when the heat is so intense that material ignites spontaneously." (Internal quotation marks omitted.) *American National Fire Ins. Co.* v. *Schuss*, 221 Conn. 768, 772, 607 A.2d 418 (1992).

[32] The respondent's fire investigator, Corry, testified that he initially thought the couch was made of rubber foam but changed his opinion to polyurethane foam. He made clear, however, that, without the ability to test the actual materials, it was impossible to be certain what kind of materials were in the couch and that a positive identification cannot be made through only a review of photographs.

[33] One of the petitioner's experts, Kelder, determined from his review of the crime scene photographs that one of the windows in the apartment was likely opened slightly during the fire. He explained that one of the photographs showed soot stains on the exterior of the building above the window, indicating that some smoke had escaped through a small opening in the window. In addition, Tomkunas testified that when he first approached the apartment, he could see smoke coming from a window in front of the apartment.

[34] The majority characterizes Corry's reliance on eyewitness testimony as unscientific. But this criticism overlooks Corry's conclusion, based on his analysis using established scientific methods, that one cannot determine the fire's burn time with any reasonable degree of certainty.

[35] In addition to his *Strickland* claim based on an alleged *Brady* violation, the petitioner has offered an alternative ground for affirming the Appellate Court's judgment. The majority has not reached this claim, so I address it only briefly. The crux of that claim is that the petitioner's criminal trial counsel rendered ineffective assistance because they failed to emphasize certain discrepancies between the petitioner's third confession and the physical evidence found at the crime scene. I have reviewed the relevant transcripts and evidence, and, for the reasons set forth in the habeas court's memorandum of decision, I am not persuaded that the petitioner is entitled to a new trial on this alternative basis.